HENRY BERG, Appellee, v. KUCHARO CONSTRUCTION COMPANY et al., Appellants.

No. 46805.

FEBRUARY 5, 1946.

REHEARING DENIED APRIL 5, 1946.

Bradshaw, Fowler, Proctor & Fairgrave, of Des Moines, for appellants.

Hansen & Wheatcraft, of Des Moines, for appellee.

OLIVER, J.—Plaintiff is a building contractor. Defendants are construction companies which had a contract for the construction of War Housing Project, Texas 41224, consisting of one hundred twenty-five apartment buildings, referred to as Liberator Village, and another contract for the construction of one hundred thirty-seven houses for Federal Housing Administration at Fort Worth, Texas, referred to as Defense Housing. Plaintiff was first employed by defendants as a carpenter fore-

man on Liberator Village. Later he entered into two subcontracts with defendants to do certain parts of the carpenter work upon the Liberator Village project and the Defense Housing project. Defendants also rented seven electric power saws from plaintiff.

This action is in four counts:

Count 1 is for damage to the power saws; count 2 is for the balance of the Liberator Village subcontract price; count 3 is for extra work performed on the Liberator Village job; and count 4 is for damages for breach of the Defense Housing subcontract.

On count 1 the jury allowed $375; on count 2 plaintiff demanded $12,890.84 and was allowed $11,509.73; on count 3 he was allowed $3,340.46; on count 4 he demanded $6,286.75 and was allowed $2,886.93. These allowances resulted in judgment for plaintiff for $18,112.12, from which defendants have appealed.

Federal Housing projects are built on a production basis similar to an assembly-line plan. One group of carpenters performs a specific part of the work, such as setting the floor joists, and moves to the next building to again perform the identical work. Each following group of workmen does some other specific part of the work on each building. Thus each carpenter or mechanic does specialized work with which he becomes very familiar. Plaintiff testified this method of organization substantially reduces labor costs and that contracts for such projects are figured upon this basis.

Liberator Village subcontract was for the erection of all interior millwork, cabinets and wood trim, application of hardware, fitting and hanging of windows, doors, screens and screendoors in one hundred twenty-five apartment buildings. The adjusted subcontract price was $29,170. That plaintiff performed this subcontract is undisputed. The controversy over count 2 involves the allocation of payments. Defendants made payments for plaintiff on pay rolls, insurance, taxes, etc., on the Liberator Village work, totaling $34,827.47. Plaintiff separated these payments into two parts, charging himself and crediting defendants with $16,745.70 advanced on the work done under the written contract and $18,081.77 on the extra

work involved in count 3 of the petition. The jury made a special finding that plaintiff had established that the amount of such advancements allocated by plaintiff for necessary expense for the work done under the written contract was correct. Accordingly the jury found plaintiff entitled to $11,509.73 on count 2. The record does not show why the jury reduced the allowance on count 2 to this figure.

The jury made another special finding that plaintiff had established $18,081.77 to be the reasonable amount of necessary expense for labor, taxes, social security, and insurance in performing and carrying out extra work on Liberator Village under the oral agreement referred to in count 3. As above noted, plaintiff credited defendants with that amount out of the $34,827.42 advanced. Of said $18,081.77, $16,702.15 was for pay roll and the remainder for taxes, social security, and insurance. Plaintiff's claim on count 3 is based upon the claimed unpaid balance of ten per cent of said labor cost ($16,702.15) for overhead and ten per cent for profit. The jury allowed $3,340.46 on count 3.

The basis for plaintiff's claim in count 3 for extra work on Liberator Village is as follows:

Under the contract defendants were to have exterior window and door frames and exterior trim set by others and to furnish the millwork, cabinets, windows, doors, etc., and plaintiff was to do the interior finish carpenter work and hang the doors, windows, screens, etc. At the time the written contract was made and plaintiff's work started, the work of the principal contractor on a few of the buildings had progressed far enough that the same were ready for the work under plaintiff's subcontract. These buildings were in satisfactory condition, as was also the small amount of the interior millwork which was then on the job.

The buildings later turned over to plaintiff were not in proper condition and much of the millwork and trim delivered later was defective or unprocessed. The window and door frames which the job specifications required to be set plumb and level and blocked with wedges were not so set nor blocked. In all of the buildings except the first few they were made of wet, green lumber that had warped and twisted out of shape. Upon

complaint of plaintiff, defendants sent some carpenters to adjust the defects but they were unable to do so satisfactorily. Thereupon defendants told plaintiff to do the work and he would be paid for it; that as long as plaintiff was already working on the windows it would be cheaper and better to have him make the corrections than to send other men to do it. Plaintiff and his men made these corrections by straightening the bowed members, plumbing and leveling the frames and wedging and blocking them and in some cases replacing them. Approximately fifty-five hundred window and door frames were corrected.

Other defects appeared in the windows and window and door frames and defendants again told plaintiff defendants would have to take care of it, that plaintiff should get it done and he would be paid for it. Much of the millwork which the subcontract required defendants to furnish was not properly processed or was not processed at all. When plaintiff showed this to defendants he was told to stop bothering defendants about it, to go ahead and do that and they would pay him for it. Plaintiff then had his workmen reprocess the millwork in his shop. Plaintiff's shop foremen testified ninety per cent of the shop time was devoted to remilling.

The screens furnished were not the proper size and plaintiff was told to take them to the shop and do that work and defendants would pay plaintiff for it. Plaintiff told Mr. Kucharo it would cost in the neighborhood of $500 to correct a certain shipment of screens. Mr. Kucharo said he thought that would be too much but told plaintiff to go ahead and do it.

The exterior doors were defective. Mr. Kucharo asked plaintiff to put some men on that work and said they were satisfied to have him make some money on that. This required considerable work on five hundred doors.

The baseboards did not comply with specifications. When plaintiff so advised Mr. Kucharo he was told to install them and that if it should be necessary to take them out defendants would take the responsibility. The inspectors for the government required them to be removed and replaced in about sixty of the buildings.

Plaintiff testified also concerning extra work to remedy

various defects in or to reprocess other materials and equipment furnished by defendants for installation by plaintiff and to various other conversations similar to those above mentioned. In one conversation Mr. Kucharo told plaintiff to "take care of the situation the way it comes in."

The principal items in the charge for extras are: blocking and reworking door frames, blocking and reworking windows, reworking sash, reworking trim and doorjambs, making and reworking screens, making up missing items of millwork, back puttying glass in exterior doors, reworking and rebuilding cupboards, reworking and assembling book shelves, replacing baseboards, reworking shelves. The minor items are: boxing for vent pipes, making window stops, reworking medicine cabinets, drilling windows.

Plaintiff kept a record of the time and wages of his employees in the extra work on Liberator Village. Said record is known as Exhibit G. Further reference to it will be made hereinafter. The time consumed in doing one extra item—that of reprocessing six thousand shelves—is not shown in said record, the reason given being that because the work on each shelf was identical and required fifteen minutes' time at $1.25 per hour no detailed record was necessary. Plaintiff arrived at the reasonable value of the extras by adding to the cost of labor, insurance, taxes, and social security (found by the jury to amount to $18,081.77) plus ten per cent of the cost of the labor for overhead and ten per cent for profit. He testified this is the customary charge by contractors.

Count 4 of the petition is for damages for the breach by defendants of the Defense Housing subcontract with plaintiff. This contract required plaintiff to do all the carpenter work on the one hundred thirty-seven houses at $315 per house. The adjusted contract price was $41,227.78. Defendants' total advances on this contract, plus truck rental, amount to $53,714.52, an overpayment of $12,486.74. The contract provides that defendants will provide materials and deliver the same to various points on the building sites as directed by plaintiff. The houses in this project were in three groups which were several miles apart. Plaintiff alleged defendants breached the contract by

failing to supply proper trim, by failing to make deliveries to points directed by plaintiff, and by so delaying deliveries as to prevent normal progress of the job on a production basis; that as a result two hundred thirty days were required for the work; that but for said breach plaintiff would have completed the work in one hundred twenty days at a profit of $7,536.75 (instead of a loss). Plaintiff credits defendants with $1,250 advanced to plaintiff, leaving a balance of $6,286.75 for which judgment is sought.

Plaintiff testified the material for the first group of ten houses in the Defense Housing project was on the job when the work started. At that time he notified Mr. Kucharo and Mr. Ingram, defendants' job superintendent, that materials must be delivered where they were needed and not two or three miles away. Plaintiff supplied Mr. Ingram with lists of materials needed and the places to which they were to be delivered, some to plaintiff's saw yard, others to plaintiff's shop for fabrication, and the remainder to the sites of the buildings. Plaintiff talked to Mr. Ingram almost daily about this.

After the first ten houses materials were not supplied so as to permit the building to continue on a production basis. Delivery of lumber for joists and subflooring was delayed. At times plaintiff waited weeks for roof decking or dimension materials. At times the workers would set half the joists of a house and then be compelled to wait for joists for the other side or shift to some other house where materials were available. At times there would be delivered to one building site joists belonging to a house far removed. The next day different materials for some other place would be delivered there.

Other materials in large quantities would not be distributed but would be unloaded wherever the truck happened to stop and left in piles of various sizes. At times loads of some particular items sufficient for ten or fifteen houses would be unloaded in a pile a block or two from the place they were to be used. Carpenters would look for joists and find none. Then the foreman would search over the project until the joists were found, secure a truck with laborers to load and deliver the materials to the proper place and unload them again. If the

materials could not be found the men would be moved to another house. At other times there would be materials at a building site but no foundations upon which to erect them. At times a crew would partially complete an operation and then be forced to move because of insufficient materials.

Stripping and application of cornice should be done by the same crew, because both processes require scaffolding and are performed as part of the same operation, but at times as many as twenty houses would be framed, but without cornices, because of failure to deliver cornice material. When cornice material was delivered it would be necessary to return to the houses, rebuild the scaffolding, and apply the delayed material.

At one time forty houses were ready for roof decking and fifteen ready for subflooring but there were no materials at hand. The superintendent refused two large truckloads of these materials which came in because he said the price was $2 per thousand higher than he was authorized to pay. As a result the houses stood without roof decking so long that rafter joists and studdings, which were green lumber, warped and bowed to such an extent that it was necessary to replace about fifty or sixty of them per building. This happened in about sixty houses in the project. Contractors on other similar projects in that neighborhood had no difficulty in securing materials.

Due to delays in supplying bathtubs it was necessary to partially trim the houses and return and finish the job later. Concrete tubs, finally secured after defendants had refused to accept cast-iron tubs which had been delivered to the job, were too large to go through the bathroom doors and it was necessary to tear out a partition, slide in the tubs, repair the partition and trim up after the plumbers finished. The trim supplied by defendants was different from that listed in the specifications and required about thirty per cent more time to install.

Plaintiff constantly complained about these matters to Mr. Ingram and Mr. Kucharo. He told Ingram he would have to lay off his men if he could not get materials for them to use, but until the work was nearly completed Ingram would not permit the release or temporary transfer of any men. (A clause in the subcontract required plaintiff "to work as many men and at such times as required by contractor.")

The houses constructed were nearly alike. Workmen were experienced, worked daily and steadily; there was no labor trouble, and no delay because of unfavorable weather or breakdown of equipment or for any reason other than the defaults of defendants.

Plaintiff testified that but for said defaults he would have completed his contract work on each house at a total expense of $232.29. He arrived at this figure by computing the time and cost of the labor, on a production basis, for each detail of the work, plus trucking expense, shop work, expense of supervision, insurance and taxes connected with the job, cleanup, etc. He testified that the work on the first ten houses, where the materials were at hand, was completed on the time schedule used in his computations. He testified also that, shortly thereafter, with the same workmen, he constructed another group of houses in that locality, under the same plans, at a cost per unit within the above-estimated cost of $232.29.

I. Defendants challenge the sufficiency of the evidence to warrant the submission of count 1 to the jury. (Assigned errors 8, 9, and 10.) Plaintiff started to work for defendants under a written contract which included the use of the power saws and in which defendants agreed ''to keep the equipment in repair and to return it when the job is finished in as good condition as when they received it, wear and tear excepted.'' After the termination of this agreement defendants continued to use the saws at the same rental price.

Plaintiff warned defendants' superintendent the saws were running with improper voltage and were burning out and that extra current should be provided. Plaintiff also told the superintendent the saws were being run without grease and plaintiff bought grease and told defendants to use it. When the saws were returned the motor and switch on one were burned out and the starter switch had been taken off. On others the motors were burned out, and on another the motor was burned out, the armature winding was burned out, and the cords were burned out and broken. Plaintiff testified the reasonable cost of repairing the saws was more than $375. The evidence was sufficient to sustain the verdict on count 1.

■ II.  Error No. 12 is predicated upon the admission in evidence of Exhibit G, which shows the time and labor charges for extras on the Liberator Village work claimed in count 3 of the petition.  Plaintiff testified Exhibit G was the daily record kept "on the job" by him in his own handwriting, showing the time worked by his various employees on extras on Liberator Village, the particular task upon which the men were working, the hours and labor charges, and that the items and charges were correct.  Plaintiff had a head foreman in charge of the men in the buildings and another foreman in charge of the men in the shop.  Each of these foremen testified he kept account of the time the various men under his supervision worked each day on the extras, that he noted it on a slip of scratch paper or piece of board and reported the same correctly each day to the plaintiff, and that plaintiff correctly recorded it at that time in Exhibit G.  The slips of paper or boards containing the temporary memoranda were usually thrown away after the foreman had made his report.

This foundation complies with the requirements of section 11281, Code of Iowa, 1939.  Exhibit G was the first permanent record (book of original entry) of the charges, was properly authenticated, and was admissible in evidence as a book of account.  Shea v. Biddle Imp. Co., 188 Iowa 952, 176 N. W. 948; Younker Bros. Inc. v. Meredith, 217 Iowa 1130, 253 N. W. 58; Duffy v. Hardy Auto Co., 180 Iowa 745, 753, 163 N. W. 370; Ricker v. Davis, 160 Iowa 37, 42, 139 N. W. 1110; Hancock & Co. v. Hintrager, 60 Iowa 374, 376, 14 N. W. 725; Jones v. General Constr. Co., 150 Iowa 194, 196, 129 N. W. 830; 20 Am. Jur. 914-916, 924-928, sections 1066 and 1071; 32 C. J. S. 559, 566, section 685.

Although Exhibit G appears to be regular on its face, defendants contend it should have been excluded because of circumstances and records which, they assert, impeach it and prove its unreliability.  The matters relied upon by defendants go merely to the weight and credibility of the evidence furnished by the book account, not to its competency.  Shea v. Biddle Imp. Co., 188 Iowa 952, 957, 176 N. W. 948; Porter v. Madrid State Bank, 155 Iowa 617, 625, 136 N. W. 666; 20 Am. Jur. 1064, section 1213.

488

■ III. A printed clause in the Liberator Village sub-contract states:

"No extra work or changes under this contract will be recognized or paid for, unless agreed to in writing by the Contractor [defendants] before the work is done or the changes made. No oral agreements will be made by either party."

This was pleaded in defendants' answer. Plaintiff based his right of recovery in count 3 for extra work on subsequent oral agreements and orders. He also pleaded that defendants waived their right to rely upon the quoted clause.

In assigned error No. 13 defendants assert the court erred in submitting the issue of waiver to the jury.

The general rule as to the avoidance of such provisions by the parties is stated in 9 Am. Jur. 17, section 23, as follows:

"Avoidance of Stipulation—By Parties.—Although stipulations in building or construction contracts requiring written orders or agreements for extra work or alterations are valid and binding so long as they remain in effect, it is equally well settled that they may be avoided by the parties to the contract. The courts have adopted various theories of avoidance which may be classed as those of independent contract, modification or rescission, waiver, and estoppel. These theories have not always been kept distinct, the courts frequently using the terms especially in the case of waiver and modification interchangeably, looking merely at the ultimate question of liability. A waiver of such stipulation by the owner is the theory on which it is most frequently avoided. Among the acts or conduct amounting to waiver are the owner's knowledge of, agreement to, or acquiescence in such extra work, a course of dealing which repeatedly disregards such stipulation, and a promise to pay for extra work, orally requested by the owner and performed in reliance thereon." See, also, annotation in 66 A. L. R. 649 et seq.

It will be noted the foregoing statement refers to avoidance of stipulation by parties. Defendants rely upon Iowa Electric L. & P. Co. v. Hopp, 221 Iowa 680, 266 N. W. 512, and earlier Iowa decisions therein cited. All of those cases deal, not

·with avoidance based upon acts of the owner but ·with avoidance based upon acts of the architect. See 66 A.. L. R. 684-689.· As stated in 9 Am. Jur. 18, section 24:

"It is generally held that neither an architect as such, nor the engineer in charge of construction work has authority to waive such a stipulation."

Iowa Electric L. & P. Co. v. Hopp, supra, and other Iowa decisions recognize that such agreements may be waived. The text in 17 C. J. S. 843, 847, section 371d, states:

"Such a provision, however, is not of the essence of the contract, but is a detail in the performance, and the requirement of a writing may be waived."

Earlier in this opinion reference was made to plaintiff's evidence in support of his claim of waiver. Under the record it is clear this was a question of fact for the jury.

The foregoing discussion and conclusions dispose also of assigned errors Nos. 14 and 16, in which defendants contend the evidence of the conversations alleged to form the basis of the subsequent oral agreement to pay for extra work in the Liberator Village subcontract violates the rule which forbids the varying of a written contract by parol. A written contract may be modified by a subsequent oral agreement which has the essential elements of a binding contract. 12 Am. Jur. 1006, 1007, section 428.

IV. The fifteenth assigned error is based upon the contention that the work which plaintiff claims as extra in count 3 was required to be performed by him under the subcontract, and that the evidence does not warrant a contrary finding. We are unable to agree with this conclusion. Mr. Kucharo on the witness stand conceded plaintiff was entitled to some allowances for some items of extras. According to plaintiff and his witnesses both parties regarded the items in question as extras and acted accordingly. The language of the subcontract does not require a contrary interpretation. It may be fairly interpreted to require that the materials and equipment furnished by defendants for attachment and installation by plaintiff be reasonably fit and proper for that purpose and that the build-

490

ings to be thereafter partially constructed by defendants be turned over to plaintiff in a reasonably fit and proper condition for the doing of the work required of plaintiff by the subcontract. The court would not have been justified in holding, as a matter of law, that any of the items listed in count 3 were not extras.

█ V. In assignment of error No. 11 defendants state that under the court's instructions they received no credit for an overpayment on Liberator Village and on Defense Housing. We do not so understand the record. On the Liberator Village work they advanced $34,827.47. The jury found they advanced $16,745.70 for labor bills, etc., incurred by plaintiff in performing the written subcontract and $18,081.77 for labor bills, etc., incurred by plaintiff for extras referred to in count 3. Defendants received credit for $34,827.47 on counts 2 and 3. This was the total amount they advanced for plaintiff on the Liberator Village work.

On the Defense Housing contract (count 4) the jury was instructed that defendants had advanced for labor bills, etc., $12,486.84 more than the adjusted contract price and would be entitled to full credit for all this amount or such part of such expenditures as was not caused by the breaches of the contract asserted by plaintiff. A special interrogatory submitted to the jury directed it to fix this amount, if any. The jury found defendants had breached the contract and, in effect, that the expenditure of all of said $12,486.64 and several thousand dollars additional was attributable to such breach. Hence, this advancement was taken into account by the jury in arriving at its verdict on count 4.

VI. Assigned errors 1, 2, 3, and 4 are based upon the refusal of the court to direct a verdict for defendants on counts 2 and 3. Although there was much conflict in the record, and defendants charge that plaintiff had changed his position and fabricated his proofs, we are satisfied the evidence was sufficient to require the submission to the jury of the claims of plaintiff on said counts.

The other principal contentions of defendants, involving counts 2 and 3 have been disposed of in previous divisions in this opinion.

VII. Reference has already been made to count 4 of the petition, which was for damages for breach of defendants' agreement in the Defense Housing subcontract to supply proper trim, make deliveries of materials to points directed by plaintiff, and for unreasonable delay in furnishing materials. The typewritten portion of the subcontract attached to the petition states defendants:

"will provide materials in sufficient quantities * * * and will make delivery of same to various points at the building site as directed by the subcontractor. * * * subcontractor will give contractor sufficient advance notice of his material requirements and contractor will make every effort to obtain same as required for the job, but contractor will not be held responsible for delays in deliveries due to conditions beyond his control.

"Subcontractor agrees * * * to work as many men and at such times as required by contractor * * *."

The printed portion provides in part:

"Fourth. No extra work or changes under this contract will be recognized or paid for, unless agreed to in writing by the Contractor before the work is done or the changes made. No oral agreements will be made by either party. * * *

"Sixth. Sub-contractor to be bound to all terms and conditions of the General Contract."

Defendants' answer admits the subcontract and other general and preliminary allegations and denies the remaining allegations of division 4. It alleges in general terms that the subcontract provided that plaintiff was bound by the terms and conditions of the general contract; that the work for which the claim was made was a part of the work required of plaintiff by the subcontract and that defendants' total advances for pay roll, etc., exceeded the contract price. The answer then refers to the "fourth" provision of the subcontract, above quoted, and asserts that provision bars plaintiff's right to recover because there was no agreement in writing for the extra or additional work before it was done.

Defendants' theory that the recovery sought in count 4 was for extra work or additional work persists throughout the

trial and upon appeal. It is erroneous and pleadings and arguments based thereon are not well founded. Count 4 was for damages for breach of contract, not for extras.

Defendants' motion for directed verdict and withdrawal of issues from the jury and to strike count 4 contains general statements that there is no competent proof to sustain a verdict for plaintiff and specific statements (1) that the evidence was inadmissible under the parol-evidence rule and (2) that the contract requires an agreement in writing for changes or extras. There was no merit in either of these specific complaints. We have already pointed out that count 4 is not a claim for changes or extra work. Nor does the parol-evidence rule prevent one who claims damages for breach of a written contract from proving such breach and his damage by parol.

Assignments of error 5, 6, and 7 are based upon the overruling of the foregoing motion and the motion for new trial. In argument defendants assail the sufficiency of the evidence of the breach and the damage. Some of this evidence has been set out earlier in this opinion. The evidence was sufficient to make those questions issues of fact.

The jury could have found that defendants breached the contract in one or more of the three particulars pleaded. Defendants argue that no liability may be predicated upon provisions of the contract that they should make every effort to obtain materials as required but would not be held responsible for delays due to conditions beyond their control. They did not plead that the delays in furnishing materials were due to such conditions. Moreover there was substantial evidence indicating that the delays were unreasonable and not due to conditions beyond the control of defendants. Likewise there was substantial evidence of misdeliveries and the furnishing of trim which did not comply with the contract. Annotation 115 A. L. R. 65 et seq.; Arkansas Bridge Co. v. Kelly-Atkinson Constr. Co., 8 Cir., Mo., 282 F. 802.

Defendants also complain of the measure of damages. The jury allowed plaintiff the profit he would have made upon the contract had it not been for the defaults of defendants. In other words, the jury charged defendants with the exact amount of the loss caused plaintiff by such defaults. Plaintiff had this

contract and defendants were demanding that he keep all of his men on the job. He completed it as he had the legal right to do. We are satisfied the measure of damages adopted was neither speculative nor remote and was a proper one. Sargent v. Frank Cram & Sons, 194 Iowa 152, 155, 186 N. W. 916; Omaha Beverage Co. v. Temp Brew Co., 185 Iowa 1189, 1195, 171 N. W. 704; Wachtel v. National Alfalfa Journal Co., 190 Iowa 1293, 176 N. W. 801; 15 Am. Jur. 556 et seq.

Defendants' briefs quote various printed provisions of the general contract, such as an arbitration clause, a provision requiring written notice of claims for damages, provisions relative to claims for extras, changes in plans, etc. No specific reference to any of these provisions was made in defendants' pleadings. The only statements therein concerning the general contract were that the subcontract provided the work was to be done according to the terms and conditions of the general contract and that the subcontract provided that plaintiff was bound by all of the terms and conditions of the general contract. No reference to any of the procedural provisions of the general contract was made in the motion for directed verdict. The procedural provisions of the general contract quoted in defendants' brief were not actually in issue between the parties in the trial of the case and upon appeal will not be considered as a basis for reversal.

We have reviewed the entire record but have set out herein only portions of the evidence favorable to plaintiff. There was evidence to the contrary. Upon each count the case presented a question of fact for the jury. No reversible error appears.— Affirmed.

All Justices concur.