SOUTHERN FIREPROOFING COMPANY, Appellant,

v.

R. F. BALL CONSTRUCTION COMPANY, Inc., Southwest Ball Construction Company and National Surety Corporation, Appellees.

No. 17388.

United States Court of Appeals Eighth Circuit.

July 7, 1964.

In September 1955 R. F. Ball Construction Company, Inc. and Southwest Ball Construction Company, joint adventurer corporations which we collectively refer to herein as "Ball", were awarded the contract for the construction of two high school plant-complexes for the Independent School District of Cedar Rapids, Iowa. The agreement provided that the work was to be performed in accord with the architect's drawings and specifications, that it was to be completed within 720 calendar days from the date of the contract, and that the completion date "shall be extended" if Ball were to be delayed in its work for stated causes. A performance bond, executed by Ball and by National Surety Corporation as surety, accompanied the contract.

On or about March 13, 1956, Ball and Southern Fireproofing Company, a partnership, executed a subcontract, dated February 18, 1956, whereby Southern agreed to perform both the exterior and the interior masonry work on the project in accord with the governing specifications and the General Conditions and other terms of Ball's contract with the owner. The subcontract provided that Ball would pay to Southern "the Lump Sum Firm Price of SIX HUNDRED FIFTY-SEVEN THOUSAND FIVE HUNDRED DOLLARS ($657,500.00) total for both schools". The agreement was on a printed form with blanks. We set forth in the margin those provisions which are pertinent here and we underline the material which was typed in the blank spaces.[1]

Paul W. Steer of Steer, Strauss & Adair, Cincinnati, Ohio, Wayne C. Collins, of Shuttleworth & Ingersoll, Cedar Rapids, Iowa, for appellant.

Richard U. Simon, of Simon & Simon, Fort Worth, Tex., and J. J. Locher, Jr., of Barnes, Wadsworth, Elderkin, Locher & Pirnie, Cedar Rapids, Iowa, for appellee.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

BLACKMUN, Circuit Judge.

This diversity controversy is one between a construction project's masonry subcontractor and the general contractor. The latter prevailed in the trial court. The subcontractor appeals.

---

1. "ARTICLE I. * * *
"This Contract Agreement is subject to and shall be governed by all * * * General Conditions and Special Conditions of the Specifications and those contained in Contract between Owners and R. F. Ball Construction Company, Inc.—Southwest Ball Construction Company (A Joint Venture), where applicable.
"ARTICLE IX. * * *
"The Contractor shall prosecute the work rapidly, continuously and uninterruptedly and shall complete the entire work within <u>as required</u> so as not to interfere or delay R. F. Ball—Southwest Ball Construction Company in completing contract on the entire building <u>as required by Owner.</u>
"The Contractor in agreeing to complete the work within the time mentioned, has taken into consideration and made allowance for the ordinary delays and hindrances incident to such work, whether growing out of delays of Common Carriers, delays in securing materials or workmen, changes, omissions, alterations, or otherwise, and is cognizant of the fact that R. F. Ball—Southwest Ball Construction Company in their contract with the Owner, is required to finish the entire

The General Conditions which were made part of the prime contract were the AIA standard form. So far as the provisions of this instrument appear to be pertinent here, we also set them forth in the margin.[2]

The litigation had its inception in December 1957 when Ball sued Southern to

work within a certain time, and failure on their part to do so renders them liable to heavy damages.

\* \* \* \* \* \* \*

"For the convenience of the Contractor, R. F. Ball—Southwest Ball Construction Company estimates that the building or buildings will be ready for the commencement of the work or its installation about when notified, 195...

"But R. F. Ball—Southwest Ball Construction Company is not to be held responsible for any loss or damage incurred by the Contractor in the event the Contractor is unable to start or complete its work as herein contemplated.

"Delays by the Contractor occasioned by failure on the part of Contractor to co-ordinate his work with that of other contractors on the job or failure on the part of other contractors to coordinate their work with that of Contractor, shall be at and for the Contractor's responsibility; and such delays, when so occasioned, shall not relieve Contractor from any of its liabilities hereunder.

"ARTICLE XVII. If at any time any controversy shall arise between R. F. Ball—Southwest Ball Construction Company and the Contractor with regard to any matter or thing involved in this contract, and which the parties hereto do not promptly adjust and determine, or which the Architect cannot decide to the satisfaction of both parties hereto, then the written orders of R. F. Ball—Southwest Ball Construction Company shall be followed and said controversy shall be decided by arbitration at the end of the work, and before final settlement is made between R. F. Ball—Southwest Ball Construction Company and the Contractor."

2. "Art. 1. Definitions. \* \* \*

"(g) All time limits stated in the Contract Documents are of the essence of the Contract. \* \* \*

"Art. 3. Detail Drawings and Instructions. \* \* \*

"The Contractor and the Architect, if either so requests, shall jointly prepare a schedule, subject to change from time to time in accordance with the progress of the work, fixing the dates at which the various detail drawings will be required, and the Architect shall furnish them in accordance with that schedule. Under like conditions, a schedule shall be prepared, fixing the dates for the submission of shop drawings, for the beginning of manufacture and installation of materials and for the completion of the various parts of the work.

\* \* \* \* \* \* \*

"Art. 15. Changes in the Work. \* \* \*

"Should conditions encountered below the surface of the ground be at variance with the conditions indicated by the drawings and specifications the contract sum shall be equitably adjusted upon claim by either party made within a reasonable time after the first observance of the conditions.

\* \* \* \* \* \* \*

"Art. 31. Damages.— \* \* \*

"The Contractor is relieved of responsibility for damages to the work due to causes beyond the control of and without fault or negligence of the Contractor.

\* \* \* \* \* \* \*

"Art. 37. Relations of Contractor and Subcontractor.—The Contractor agrees to bind every Subcontractor and every Subcontractor agrees to be bound by the terms of the Agreement, the General Conditions, the Drawings and Specifications as far as applicable to his work \* \* \*

"The Subcontractor agrees—

"(a) To be bound to the Contractor by the terms of the Agreement, General Conditions, Drawings and Specifications, and to assume toward him all the obligations and responsibilities that he, by those documents, assumes toward the Owner. \* \* \*

"The Contractor agrees—

"(d) to be bound to the Subcontractor by all the obligations that the Owner assumes to the Contractor under the Agreement, General Conditions, Drawings and Specifications, and by all the provisions thereof affording remedies and redress to the Contractor from the Owner. \* \* \*

"Art. 40. Arbitration.—All disputes, claims or questions subject to arbitration under this contract shall be submitted to arbitration in accordance with the provisions, then obtaining, of the Standard Form of Arbitration Procedure of The American Institute of Architects, and this agreement shall be specifically enforceable under the prevailing arbitration law, and judgment upon the award rendered may be entered in the court of the forum, state or federal, having jurisdiction. It is mutually agreed that the decision of the arbitrators shall be a condition precedent to any right of legal action that either party may have against the other. \* \* \*"

recover damages, of comparatively small amount, resulting from a fire loss alleged to have been sustained on the job because of Southern's negligent handling of a fire laden salamander. Upon stipulation this claim was dismissed with prejudice but without effect upon a pending counterclaim filed by Southern alleging that sums were due it under the subcontract and seeking to compel arbitration under the federal Arbitration Act of 1947, 9 U.S.C. §§ 1–14.

Judge Graven, after a hearing, entered an order in February 1960, denying Southern's application for arbitration. This denial flowed from the court's conclusion that the contract for the construction of these Iowa public school buildings was not one "evidencing a transaction involving commerce", within the meaning and reach of the Arbitration Act. Southern thereupon amended its counterclaim, did not thereafter seek to compel arbitration, and asserted damages for breach of contract.

The case in due course proceeded to trial before Judge Delehant without a jury. In its trial posture, therefore, although cast in the form of a counterclaim, it was an action by Southern against Ball for damages.

The issues as they come to us, with one possible addition noted below, concern:

(1) Ball's liability to Southern for damages incurred by delay;

(2) Ball's liability to Southern for the cost of constructing a certain wall; and

(3) Ball's liability to Southern for damages incurred by Ball's refusal to arbitrate.

Each of these issues was decided adversely to Southern. We consider them in order.

A. The delay. The trial court specifically found that, as a result of delays, Southern incurred additional costs amounting to $47,088.14. There is no challenge here to this conclusion or to this figure. Judge Delehant also found, however, that the delay was not the fault of Ball but that its "prime proximate cause" was subsurface conditions at the two sites. To this Southern takes exception. Southern's argument is that, under the contract documents and the evidence, Ball is responsible for Southern's increased costs due to the subsurface conditions; that even apart from this Ball is responsible because of its own delays; and that Ball's progress schedules were relevant and required enclosure by December 1, 1956, so as to relieve Southern of the greater expenses which would be occasioned by exterior work in the winter.

Ball's position is that Southern's reliance on Article 15 of the General Conditions relating to the subsurface interjects into the case an entirely new theory which was not pleaded and which was not within the scope of the trial; that Article 15 was not a contractual obligation to pay Southern any increased cost it incurred; that the subcontract contained no warranty as to dates for Southern's work; that the instrument's very language indicated the possibility of delay; that the progress schedules were not warranties; that their contents were not even known to Southern until after the subcontract was executed; that by then Southern was aware of delays already incurred; that the delays on the job were not occasioned by Ball; that the subsurface conditions were their proximate cause; and that Ball did not interfere with Southern's work.

Ball prepared progress schedules, both before and during construction, for each school. These were required by Article 3 of the General Conditions and were revised from time to time. Only two were received in evidence. Although Southern knew of their existence, these were seen by it for the first time when they were called for at the trial. These two were dated October 1955 and thus were after the prime contract but before the subcontract. The schedules set forth estimated starting dates for the masonry work of June 1 and July 1, 1956, respectively, for the two schools, and De-

cember 1 as the completion date. Each specified May 14, 1957, as the total construction completion date. Southern actually began its work on one school in late May and on the other in late July 1956. Its work was completed in January 1958 and December 1957, respectively.

Early in the construction it was ascertained that, despite prior soil tests, subsurface conditions (such as quicksand at one site) varied substantially from those anticipated. These required material modification of part of the subsurface plans for one school and the complete redesign of the foundation and subsurface portions of the other. Delay resulted. The redesign plans for the one school were not received in their entirety until July 1956.

Southern learned of the subsurface problems at both sites some weeks before the subcontract was executed. It complained thereafter about the delay in the progress of the work and claimed additional compensation. Ball just as consistently disclaimed responsibility for the delay and, partially at least, attributed it to poor management on Southern's part. Cost factors mounted. Among these were the winter of 1956–57 and consequent protection-from-the-cold costs, wage increases, additional equipment rental and a fire loss.

We recognize, as did the trial court, that under certain circumstances a prime contractor is responsible to a subcontractor for delay and failure to adhere to work schedules and sequence. Guerini Stone Co. v. P. J. Carlin Constr. Co., 248 U.S. 334, 340, 39 S.Ct. 102, 63 S.Ct. 275 (1919); United States ex rel. Gillioz v. John Kerns Constr. Co., 140 F.2d 792, 795, 152 A.L.R. 1340 (8 Cir. 1944); Great Lakes Constr. Co. v. Republic Creosoting Co., 139 F.2d 456, 464 (8 Cir. 1943); Freeman Contractors, Inc. v. Central Sur. & Ins. Corp., 205 F.2d 607, 613 (8 Cir. 1953); Berg v. Kucharo Constr. Co., 237 Iowa 478, 21 N.W.2d 561, 569 (1946); King v. City of Des Moines, 99 Iowa 432, 434–435, 68 N.W. 708 (1896); Kehm Corp. v. United States, 93 F.Supp. 620, 623, 119 Ct.Cl. 454 (1950); see Heating Maintenance Corp. v. State, 47 N.Y.S.2d 227 (Ct.Cls. 1944).

■ Nevertheless, we affirm on this issue. We do so in the light of the following facts which find adequate support in the record and for the following reasons:

1. There was no positive evidence that progress schedules were ever seen by Southern before the subcontract was executed. As late as March 21, 1956, after the subcontract had been signed, Southern by letter asked Ball for copies of the schedules "so that we may plan accordingly." And on May 3, in another letter, Southern outlined the anticipated starting dates for its work in one school's several areas without any reference to the schedules.

2. The progress schedules struck the trial court, and they strike us, as being nothing more than serious estimates and calendars, revised from time to time, for work coordination purposes and perhaps as a disciplinary and incentive measure for all concerned. In the May 3, 1956, letter Southern noted that the date of readiness of Area 5 of one school was "Not yet determined". This hardly lends support to the binding character of October 1955 progress schedules or to Southern's reliance thereon. Undoubtedly, Ball and Southern in their negotiations leading to the subcontract discussed performance dates and when Southern would be expected to fulfill its part of the construction program. There is correspondence which so indicates. This would be normal and expected. But we see nothing in these progress schedules which smacks of guaranty or warranty or positive representation or that they were incorporated into and became a part of the subcontract.

3. Southern and Jacob Lichter, its dominant partner, were experienced in their field and had been in business for many years. Mr. Lichter on the witness stand characterized himself as a man "of vast experience in the masonry

field". If progress schedules and allotted work time were vital and if Southern placed basic reliance on them, we would expect that incisive language to that effect would have appeared in the agreement.

4. Even if the progress schedules served a purpose as between the owner, the architect, and the contractors, we interpret the contract documents themselves as impressing upon them something less than significant contract formality. Article 3 of the General Conditions makes the schedules of both detail drawings and of work completion "subject to change from time to time in accordance with the progress of the work". This emphasizes their expectant and non-contractual character.

5. Neither Ball nor Southern knew or had reasonable cause to know of the subsurface conditions before they were actually discovered.

6. Southern knew of the existence of subsurface problems at both sites before the subcontract was executed. This fact gives a hollow ring to Southern's claim that Ball's lack of diligence delayed the discovery of the adverse subsurface conditions.

7. The trial court found no convincing proof that Ball failed to coordinate its work with Southern and other subcontractors according to customary standards on jobs of this size, or that Ball delayed or interfered with Southern's work, or that the disparity between progress schedules and actual performance was caused by Ball. The 720 day limit contained in the prime contract was not inflexible as is demonstrated by the agreement's exculpatory provisions.

8. It is true that the subcontract was specifically made subject to the General Conditions comprising a part of the prime contract. It is also true that Article 15 of the General Conditions provided that if a subsurface situation was at variance with what was indicated by the drawings, the prime contract "shall be equitably adjusted upon claim by either party within a reasonable time".

These provisions, however, do not operate together to create a claim for Southern against Ball. The pertinent paragraph of Article 15 was directed to subsurface conditions. Southern had nothing to do with subsurface problems although, as is readily conceded, their existence resulted in a delay in Southern's work. The paragraph was for Ball's protection and we fail to go along with the argument that, being for Ball's protection, it is to be translated into derivative protection for Southern as against Ball. See United States v. Rice, 317 U. S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942). Here again, if this had been the intention of the parties we would expect that these experienced contractors would have incorporated a provision to this effect in their agreement. We note in passing, for what additional tone it affords, that Article 31 of the same General Conditions relieves Ball of responsibility for damages to the work due to causes beyond its control and without its fault.

9. The subcontract is silent where, if Southern's arguments are to be persuasive, one would expect it to be positive and specific. It does not state that Southern was to have the opportunity to complete its exterior work by December 1, 1956, or that it was obligated so to do. It does not state that Southern would have no exterior winter work. It expresses no precise performance period for Southern. The avoidance-of-winter aspect appears, if at all, only through the progress schedules and the 720 day construction period originally specified.

10. The prime contract was substantial. Its expressed consideration exceeded $4,748,000. The schools were not single buildings. Each embraced five separate areas. The project was complex. The possibility of difficulties from many points would make unlikely any intentional undertaking on Ball's part that enclosure of both structures had to be effected by December 1, 1956.

11. The subcontract itself denies specificity in Southern's work dates. Although the printed form possessed blanks for the statement of any desired

definiteness as to the completion of Southern's work and of Ball's overall work, and as to Ball's estimate of the time when Southern's work might begin, these three blanks were filled in, respectively, with "as required", "as required by Owner", and "when notified". These are terms of indefiniteness. They fall far short of any date assurance to Southern and of any time guarantee. We do not relate the filled-in words, as Southern would have us do, to any positive requirement of "constructional fidelity" to then existing editions of the progress schedules or to the originally stated 720 day construction period. Instead, they fit into a concept of reasonable flexibility and into the practical necessities of the overall progress of the work. They give, as seems proper, the prime contractor some right as to the placement of Southern's work into its appropriate niche in the project's development. A standard of "within the bounds of reason" is the most Southern can expect. Valentine v. Patrick Warren Constr. Co., 263 Wis. 143, 56 N.W.2d 860, 867 (1953). There was no excursion beyond those bounds here. See Arrow Sheet Metal Works v. Bryant & Detweiler Co., 338 Mich. 68, 61 N.W.2d 125, 129 (1953).

12. We are not impressed by Southern's suggestion that an oral agreement was effected with Ball in December 1955 when Mr. Lichter and Ball's Mr. Hubbard conversed, that Southern was then guaranteed a December 1956 completion date, and that this complemented the later written subcontract. With no pleading to this effect and no prayer for reformation, the argument sounds like an afterthought. Here once again, if a completion date was agreed upon and was vital, we would expect that Southern and Mr. Lichter, with all their wide experience, would have seen to its incorporation in the written subcontract. The fact that Southern may have proceeded to order materials before the formal signing of the subcontract does not persuade us otherwise. Some, and perhaps all, of these orders were made contingent upon formal execution of the subcontract. We regard this situation as a normal one for the application of the parol evidence rule. The trial court correctly rejected Southern's offer of proof as to the claimed oral agreement. Miller v. Morine, 167 Iowa 287, 149 N.W. 229, 231 (1914); In re Simplot's Estate, 215 Iowa 578, 246 N.W. 396, 402–403 (1933); Cunningham Bros., Inc. v. City of Waterloo, 254 Iowa 659, 117 N.W.2d 46, 51 (1962).

We therefore conclude that the trial court's determination that Southern's additional costs incurred by delay are not attributable to any fault of Ball and that Ball is not contractually liable for those costs was correct.

B. The wall. Ball required Southern to construct of masonry a certain wall in one of the schools. Southern contended that the plans called for metal and glass and not masonry and that the wall was not its responsibility. It claimed the $1,957.35 cost of the wall as an additional amount due it on a change order.

This issue emerges from a suggested inconsistency in the architect's plans. It is said that two drawings indicated a metal and glass construction and were supported by a third or detail drawing generally referring to the wall as "glass and panels." A fourth drawing, on a slightly smaller scale, of the elevation indicated that the wall was to be of masonry and clearly bore the description "face brick." The matter was referred to the architect. It rejected Southern's contention, interpreted the plans as having no discrepancy, instructed Southern to proceed with masonry, and indicated that the claim could be settled by arbitration.

There are, of course, factors which tend to support Southern's position, such as the relative scales of the drawings, the omission of the wall from Southern's bid computations, and Ball's request of the architect for a change order as to this item. We cannot say, however, in view of the fourth drawing and the position taken by the architect, that the result reached by the trial court rests on findings of fact which are clearly er-

roneous. The court's decision on this issue must therefore stand.

C. The refusal to arbitrate. Southern's counterclaim in its original form sought to compel arbitration under the federal Arbitration Act. That relief, as hereinabove noted, was denied. Southern then amended its counterclaim so that, as amended, it did not seek specific performance of arbitration but, instead, only asked for $2,500 damages attributable to Ball's refusal to arbitrate. The situation, therefore, is one where Southern, being unsuccessful in its quest, now seeks to recover its expenses of that unsuccessful endeavor.

The trial court, speaking through two successive district judges, did not hold that Ball and Southern had not agreed to arbitrate. It held only that they were not entitled to the relief which Southern claimed under the Arbitration Act. We, like the district court, are not inclined to allow Southern, as an element of damage, the expenses it claims to have incurred by reason of its unsuccessful attempt to compel federal arbitration when it no longer pursued that specific remedy after receiving the adverse decision below.

There is one additional minor point which merits comment. Southern asserts that, in any event and wholly apart from the damage elements asserted, the sum of $267.37 remains unpaid on the subcontract itself, and that it is at least entitled to judgment for this amount. Southern's amended counterclaim appears to be broad enough to embrace this item. However, neither the trial court in its memorandum nor Ball in its brief refers to it. Southern's references to the record on the point are sparse and our own examination of the testimony and of the numerous exhibits, although resulting in some supporting material, fails to provide us the assurance we must have before directing the entry of judgment for Southern on this point. Because this small item may have been overlooked by the trial court in its proper concern for the more weighty issues, we merely suggest, without expression of opinion, that, if Southern still feels it is entitled to this additional amount, relief may be available to it in the district court under Rule 60(b), F.R.Civ.P.

The trial court's judgment in favor of Ball on Southern's counterclaim is affirmed in all respects except that leave is granted the trial court to entertain a motion by Southern under Rule 60(b) solely with respect to the claimed item of $267.37. For purposes of the taxation of costs, Ball is to be regarded as the prevailing party here; its costs with respect to the printing of the supplemental record in this court, however, are denied.