# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1695

_____

Rambo Associates, Inc.,             *
                                         *

          Appellant,           *

                                         *    Appeal from the United States

        v.                         *    District Court for the

                                         *    Northern District of Iowa.

South Tama County Community    *

School District,                 *

                                         *

          Appellee.            *

_____

Submitted:  November 17, 2006
Filed:  May 31, 2007

_____

Before MURPHY, ARNOLD, and BENTON, Circuit Judges.

_____

ARNOLD, Circuit Judge.

Rambo Associates, Inc., brought an action for breach of contract and unjust enrichment against the South Tama County Community School District. Following a bench trial, the district court entered a $2,500 judgment in favor of Rambo on the breach of contract action and entered judgment for South Tama on the unjust enrichment claim. *Rambo Assocs., Inc. v. South Tama County Cmty. Sch. Dist.*, 414 F. Supp. 2d 887 (N.D. Iowa 2006). Rambo appeals the judgment. We affirm the judgment with respect to the contract claim but vacate the judgment with respect to the unjust enrichment claim and remand for further proceedings regarding that claim.

I.

Rambo is an architectural firm and an educational-facilities consultant based in Nebraska. South Tama is a school district in Eastern Iowa. In 1995, South Tama was considering building a new school; it had several older buildings, all built before 1969. South Tama's superintendent, Dr. Clarence Lippert, contacted architectural firms to ask whether they were interested in conducting a study to determine what would be necessary to put South Tama's existing buildings in condition to provide its students with a quality education for the next thirty to fifty years and to determine what new construction might be needed. South Tama identified Rambo as a candidate for conducting the study, and Rambo later made a presentation to the board of South Tama about Rambo's services and its business model. The district court found that Rambo differed from traditional architectural firms because it had many former educators and school administrators on its staff and had "tremendous experience with the funding for public school projects and in the public relations necessary to be successful in a local school bond election." *Id.* at 890.

In 1996, after Rambo sent South Tama a proposed agreement and the parties agreed on some modifications to its terms, Rambo and South Tama entered into a contract for Rambo to do the study. South Tama maintains that the parties agreed only that Rambo would prepare the study and assist the school district in passing a bond issue to fund a new school building that was included in the study. Rambo, however, asserts that the contract obligated South Tama either to use Rambo's services until the completion of any project in the study that South Tama implemented or to compensate Rambo for the reasonable value of all of the services that it provided.

Initially, we note that the agreement here is as far from a model of clarity as any that we can recall ever having reviewed. The contract consisted of a first page titled "standard agreement between owner and educational facilities consultant" and two attachments. The first page included general terms, referred to the attachments, and

was signed by the parties. Attachment A described the work included in the study and the fees for that work. Attachment B was a standard form contract between an architect and an owner, which the parties had modified.

The contract began with the following agreement:

The Owner/District [South Tama] and Educational Facilities Consultant [Rambo] agree to the scope of consultation work set forth below and in Attachment A, and subsequent attachments jointly approved addressing school facilities ... incorporated in initial and/or subsequent phases of Educational Facilities Consultation. [Rambo], at the request of [South Tama], shall continue to provide services through further planning and implementation phases of facilities projects ... addressed in initial consultation phases."

The parties stated above their signatures that they "entered into [the agreement] ... with endorsement of the work outlined in Attachment A and authorization to proceed."

Attachment A, after explaining what was included in the study (Phase One), provided that Rambo would receive no more than $5,900 in fees and $4,000 in expenses for Phase One; the attachment also referred to the $5,900 fee "as a retainer for [Rambo's] work as outlined through presentation of the study to the board."

On the first page of the agreement, the parties referred to Attachment B:

[Rambo's] services shall, at the request of [South Tama], specifically extend curriculum-based Master Planning completely through the funding or Bond issue period, Educational Programming, Schematic Design and Design Development Phases, and Project Management and Cost Management Systems utilized. Definitions of these services and

-3-

other terms and conditions integral to this Agreement are provided in Attachment B. Subsequent phases may be authorized by [South Tama] for addressed projects or related portions or variations thereof or [sic] subject to the terms of [Attachment B] unless otherwise mutually agreed in writing.

Attachment B, which referred to Rambo as the "Architect," rather than the "Educational Facilities Consultant," stated that it was an agreement between the parties "[f]or the following project":

School facilities, including outdoor and other support facilities, through all Educational Consultation, Planning, and Construction Phases addressed within this Agreement.

This Agreement applies to work on facilities projects or portions thereof addressed in Educational Facilities Consultation and Master Planning by Rambo.

Attachment B did not use the term "Phase One" but described the "scope of [Rambo's] basic services" during certain phases: During the "schematic design" and "design development phase[s]," Rambo would provide "planning and design services", and during the "construction documents," bidding or negotiation," and "construction phase[s]," Rambo would provide "technical architectural services." Attach. B, Art. 2. "Additional services" were also listed in Attachment B, and the parties inserted the words "See Attachment 'A' " after three of the additional services: "analyses of the owner's needs and programming" the project's requirements, "financial feasibility or special studies," and "planning surveys, site evaluations or comparative studies of prospective sites," §§ 3.4.1, 3.4.2, 3.4.3, which Rambo's president, Merle Rambo, testified were services that Rambo agreed to perform as part of Phase One. Attachment B also referred to Rambo's "assistance during fund preparation." The last page of the attachment was a fee schedule of "recommended compensation" for

-4-

architectural services. After stating on the signature page of the agreement that South Tama "may authorize" "[s]ubsequent phases," the parties agreed that "[f]or services to be completed by [Rambo], fees shall be negotiated as a lump sum or other basis appropriate to each project, with total compensation not to exceed" those in the fee schedule in Attachment B.

After the contract was signed in 1996, Rambo began working with South Tama on Phase One and on an effort to get a bond issue passed to finance building the new school that was included in Rambo's study. In 1999, however, the voters rejected the bond issue. Before the election, South Tama paid Rambo $9,875.88, a sum that was calculated based on fees and expenses for Phase One set out in Attachment A.

For most of the next three years, the parties had little contact with each other. In 2002, Dr. Lippert retired, and South Tama hired a new superintendent, Larry Molacek, in July of that year. Shortly afterward, a representative of Rambo contacted Mr. Molacek seeking to work with South Tama on building the proposed school. Rambo then did extensive work on developing a financing plan for the school and assisting South Tama with another attempt to pass a bond issue. The unsuccessful 1999 bond issue was to be financed solely by increased property taxes; this time, with Rambo's assistance, the school district decided to seek funding for the necessary bonds through a sales tax increase and a "physical plant and equipment levy" (PPEL) funded, at least in part, by an "income surtax," *see* Iowa Code Ann. § 298.2.

Mr. Molacek first asked Rambo to prepare information to use to get support from the school board; Rambo prepared, *inter alia*, a long-term tax management and facilities master plan that included charts illustrating how the PPEL and sales-tax funding would be blended. Mr. Rambo also provided a sample budget for building the $8.995 million school, which listed the cost of Rambo's services at $599,000. At Mr. Molacek's request, Mr. Rambo led a finance workshop for the board in the

summer of 2003. According to the minutes of an October board meeting, Mr. Rambo presented "an overview of a tax management plan" related to construction projects that the district was contemplating; Mr. Rambo described this meeting as an "opening statement" to tell the public and press about how funding could be obtained for a new school. Mr. Rambo testified that South Tama decided in November, 2003, to present the matter to the voters. In the election campaign that followed, Rambo, in particular employee Kelli O'Brien, worked closely with the school district. Rambo's work for South Tama during the 2002-2004 period included other services, such as calculating the cost of altering the planned school building (designed to house pre-kindergarten through fifth-grade) so that grades six through eight could be added in the future.

In February, 2004, the increased sales tax was presented in a county-wide election, and the measure passed. But the next month, the school district's voters narrowly defeated the bond issue, without which South Tama could not use the funds passed in February to construct the school. After this latter election, Ms. O'Brien began working on an effort to return the bond issue to the voters in October. But South Tama's board decided not to continue working with Rambo and was negotiating an agreement with another architect, and with a construction manager as well. South Tama informed Rambo of the change in July, 2004. The district court found that after the March, 2004, election, South Tama was "left in the unusual position of having a funding mechanism for payment of bonds but no ability to issue bonds," but that the voters "[u]ltimately ... understood that irony" and passed the bond issue in October. *Rambo*, 414 F. Supp. 2d at 895. By the time of trial, South Tama was in the midst of building a school designed by the new architect for pre-kindergarten through fifth grade.

When Rambo first learned that another company might be hired, a Rambo representative told South Tama that it would have to pay $80,000 to terminate Rambo's services. The representative later indicated that South Tama would have to

pay between $130,000 and $135,000 for termination; he then raised the figure again, this time to $200,000. When the parties were unable to resolve the dispute, Rambo initiated this lawsuit. South Tama moved for summary judgment, contending that Rambo was entitled to $9,875.88 in compensation and had been paid in full. Applying Iowa law, the district court denied the motion, concluding that there "was an ambiguity in the contract as to the scope of work initially authorized and how requests for additional services were to be authorized." *Id.* at 890.

After a bench trial, the court again found an ambiguity in the contract "as to the scope of work authorized," *id.* at 893; it concluded, however, based on extrinsic evidence, that South Tama authorized "only the Phase One work and services" in the agreement and "would not agree to more," *id.* at 898-99. It further found that South Tama "never intended to authorize" Rambo to provide other services except for assisting the school district in passing a bond issue, for which Rambo's fees were limited to $2,500 under Attachment B, § 12.2.2. *Id.* at 899.

The parties agree that the contract authorized Rambo to complete the study and that South Tama authorized Rambo's assistance in obtaining funding. But the parties disagree both as to how much Rambo should be compensated for its work and whether South Tama authorized Rambo to perform other services for which it should be paid. Rambo claims that it is entitled to more than $200,000 in additional compensation.

II.

A.

Rambo maintains first that South Tama agreed under the contract that if the school district decided to implement any project included in Rambo's study, Rambo would work on that project through the construction phase. We disagree.

-7-

Rambo does not take issue with the district court's decision to apply Iowa law to the agreement. Under Iowa jurisprudence, we "generally review the construction and interpretation of a contract as a matter of law." *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999). To interpret a contract, we "give effect to the language of the entire contract in accordance with its commonly accepted and ordinary meaning." *Home Fed. Sav. & Loan Ass'n of Algona v. Campney*, 357 N.W.2d 613, 617 (Iowa 1984). "If the contract is ambiguous and uncertain, extrinsic evidence can be considered to help determine the intent." *Hartig Drug*, 602 N.W.2d at 797. An ambiguity exists if there is an uncertainty as to "which of two reasonable interpretations is proper." *Id.* In its opinion, the district court stated that the contract was ambiguous as to the scope of the work that South Tama authorized. The question of whether an ambiguity exists is a question of law, which we review *de novo*. *See id.* We review the district court's factual findings for clear error. *See Antolik v. Saks, Inc.*, 463 F.3d 796, 798 (8th Cir. 2006).

We agree with the district court that the contract obligated South Tama to hire Rambo only to perform the study, but we reach this conclusion based on the plain language of the agreement. Here the first page of the contract includes language emphasizing the necessity of South Tama authorizing work beyond the "initial consultation phases" before Rambo could proceed with it. In the first paragraph, the contract states, "[Rambo], *at the request of [South Tama]*, shall continue to provide services through further planning and implementation phases of facilities projects ... addressed in initial consultation phases" (emphasis added). And the contract repeats the same language several paragraphs later when it states that Rambo's "services shall, *at the request of [South Tama]*, specifically extend curriculum-based Master Planning completely through the funding or Bond Issue period, Educational Programming, Schematic Design and Design Development Phases, and Project Management" (emphasis added).

Under Iowa law, a contract should be interpreted so that none of its terms is rendered superfluous. *See, e.g.*, *DeJong v. Sioux Center, Iowa*, 168 F.3d 1115, 1120 (8th Cir. 1999). We thus read the phrase "at the request of [South Tama]" as a necessary condition for Rambo to do work beyond the study. And we note that the signature page similarly stated that "[f]ees for and *authorizations to proceed* with professional services *shall be established and approved by [South Tama] for each phase or specific scope of services*" (emphasis added).

Our conclusion is bolstered by the statement above the parties' signatures, which, as we have already said, endorses "the work outlined in Attachment A." Notably, the statement refers only to Attachment A, which describes the work to be performed on the study through its presentation to the board (Phase One), and does not mention Attachment B, which describes other "phases" of work. As we have noted, the section of the signature page that refers to Attachment B states that "[s]ubsequent phases may be authorized by [South Tama]." Viewing the contract as a whole, *see Koenigs v. Mitchell County Bd. of Supervisors*, 659 N.W.2d 589, 594 (Iowa 2003), we conclude that the parties agreed to follow the terms set out in Attachment B only if South Tama "established and approved" "[f]ees for and authorizations to proceed" with other services beyond Phase One.

For all of the above reasons, we reject Rambo's contention that the contract obligated South Tama to employ Rambo throughout the project once the school district decided to implement it.

B.

The parties agree that South Tama asked Rambo for assistance in obtaining funding for the new school and that Rambo was authorized to provide that assistance.

But Rambo maintains that the district court should not have limited its fee for this work to $2,500.

We think that the district court correctly concluded that the issue of compensation due to Rambo for its help in obtaining funding is governed by § 12.2 of Attachment B:

12.2  ASSISTANCE DURING FUNDING PREPARATION

12.2.1  Should the District proceed with a Bond Issue or other funding to support financing for facilities, [Rambo] shall provide sketches, narratives, assistance in development of the selected Educational Program, and assistance necessary for organization and communication of the Bond Issue within the District.

12.2.2  Fees applicable to this work performed prior to funding shall be Two Thousand Five Hundred Dollars ($2,500.00) ... Should successive attempts be required for passage of a Bond Issue, [Rambo's] employment shall be continued with compensation and all other provisions above remaining the same.

Rambo contends that § 12.2 is not applicable, and that we should rely instead on language in Attachment A, which provides that "[w]hile not included in the scope of this agreement and compensation therein," Rambo may educate the community about the study "as a public service."  Rambo argues that this provision of Attachment A more specifically addresses Rambo's efforts in obtaining funding and therefore it, rather than § 12.2.2, governs.  But the plain language of § 12.2 requires Rambo to perform a broad range of activities to assist South Tama in getting funds for facilities, and it sets a limit on compensation for this work at $2,500.  We conclude that § 12.2, not the provision cited by Rambo, addresses the circumstances at issue here.  The

provision upon which Rambo relies is more general; it could encompass educating the public about the study at any time, not necessarily in circumstances related to funding. We note, moreover, that the provision's reference to services performed "as a public service" contemplates work performed without pay, which manifestly would not support Rambo's request for additional compensation.

## C.

We turn now to Rambo's contention that South Tama in fact authorized it to perform other services beyond the scope of Phase One (other than assisting with fund raising) and that it is therefore entitled to compensation under the contract. The district court found that Rambo performed services other than those described as Phase One or outlined in § 12.2, but it concluded that the contract did not entitle Rambo to additional compensation for those services.

The district court found that Rambo completed the Phase One study "long before Molacek commenced his employment in July 2002" and that afterward South Tama "asked for many items of additional information, and it appeared that Rambo supplied each and every one of them." *Rambo*, 414 F. Supp. 2d at 894, 896. According to the court, Rambo "also greatly assisted in efforts to pass a bond issue." *Id.* at 894. Thus the district court found that after completing Phase One, Rambo not only assisted South Tama in its efforts to pass the bond issue but performed other work that South Tama asked it to do.

But the district court also observed that throughout the parties' relationship there was no documentation about "either party's concern that Rambo may have exceeded the scope of work contemplated by Phase One," that [n]o one at Rambo ever said that Phase One was complete or that services being requested by the Board fell outside of Phase One," and that there was "no documentation to suggest that the school district

-11-

ever asked about whether its requests for additional information would be billed to them at some point." *Id.* at 893-94. In addition, the district court found that South Tama "never intended to authorize work beyond Phase One" (other than fund raising), and that the parties had not negotiated a fee for such work.

As we have emphasized, the agreement stated that Rambo would perform additional services "at the request of [South Tama]." Because the word "request" is not defined in the agreement, we give it its ordinary meaning, *see Federal Land Bank of Omaha v. Bollin*, 408 N.W.2d 56, 60 (Iowa 1987), and conclude that the district court's finding that South Tama "asked" for information after Phase One was completed plainly shows that the information was provided at South Tama's request. And we cannot see why Rambo's right to compensation, if any, would be affected by the degree to which South Tama knew whether the services that it requested fell within Phase One.

We nonetheless agree with the district court that Rambo cannot recover compensation under the contract for services that did not fall within Phase One or § 12.2 because South Tama did not agree to a fee for that work. The agreement provides that "*[f]ees* for and authorizations to proceed with professional services *shall be established and approved by [South Tama] for each phase or specific scope of services*" (emphasis added). We therefore believe that South Tama was not obligated under the contract to pay for any work unless the school district had "established and approved" fees for the "phase or specific scope of services."

At trial, Rambo did not offer evidence that South Tama specifically agreed to a fee for the additional services; Rambo relied instead on a lump-sum fee of $599,000 that it had included in the sample budget given to South Tama in preparation for the 2004 bond election. The sample budget illustrated how the proposed school could be built for $8.995 million and itemized some specific costs, including a $599,000 fee for

-12-

Rambo's services. (Under the agreement, Rambo's fee for its work on an $8.995 million school building could be no more than $663,150. *See* Attachment B.) In addition to the budget, Rambo relied on § 11.2.2 of Attachment B, which stated that if Rambo's compensation was based on a "stipulated sum," the company would receive a certain percentage of its total fee as a "progress payment for Basic Services" in "each phase" of the project. Using $599,000 as the "stipulated sum," Rambo argued below that § 11.2.2 entitled it to a percentage of that sum for its work on "Programming/Analysis" and another percentage for its work on the "Schematic Design Phase." But the district court found that the fee of $599,000 was "only a proposal," rather than a stipulated sum to which the parties had agreed, and we do not think that its finding was clearly erroneous. We therefore conclude that the $599,000 figure cannot form the basis for any compensation for Rambo's services. The district court quite correctly decided that the contract did not provide for payment for these services.

## D.

Rambo maintains that even if the $5,900 cap on fees for Phase One and the $2,500 cap on fees for seeking funds applied initially, the parties had a contingency arrangement under which South Tama was required to compensate Rambo fully for all of its pre-funding work if funding was obtained. As Rambo points out, the district court compares the parties' agreement to an attorney's contingency-fee contract; the court states that the contingency did not occur because South Tama did not succeed in passing the bond issue and obtaining funding for a new school "while associated with Rambo." Rambo argues to the contrary that the contingency occurred either when it assisted South Tama in the successful sales tax election (even though the bond issue failed), or when the bond issue passed because the measure would not have succeeded without Rambo's earlier help.

-13-

The district court found that Mr. Rambo was willing to continue to provide services to South Tama because his "experience with scores of other school districts and his impressive success in assisting successful bond issue elections gave him the confidence that he could get a bond issue passed in South Tama and that he would be the architect for the new school." *Id.* at 894. The court later referred back to this discussion and analogized it to a contingency arrangement. "The answer again lies in the fact that the parties were operating under something analogous to a lawyer's contingent fee agreement. That is, Rambo was banking on successful elections and subsequent negotiation of its fee from those revenues." The court then concluded that the "contingency did not materialize during Rambo's association with the school district."

We note that the district court does not refer to any contract terms that could create a contingency arrangement or state specifically that an enforceable contingency contract existed between the parties. Rather than citing a particular term in the agreement that would give Rambo a right to funds, the court states that Rambo continued to assist South Tama because it "was banking on successful elections and subsequent negotiation of its fee from those revenues." But one party's expectations do not normally create a contract, and the district court found that Dr. Lippert, who signed the contract for South Tama, "would not have agreed to any provision that obligated the District to the additional payment now requested by Rambo." Under the agreement, South Tama had to approve "[f]ees for ... each phase or specific scope of services," and we simply cannot locate anything in the agreement or the evidence where South Tama intended to enter into a contingency-fee arrangement. After carefully reviewing the agreement and the evidence, we conclude that there is no contingency agreement here, only a simple hope or expectation on Rambo's part. As we have said, under the contract fees were set for particular services that Rambo performed: $5,900 for Phase One and $2,500 for help with "Fund Preparation." That is all that the contract obligated South Tama to pay.

We reject, moreover, Rambo's contention that a contingency-fee arrangement is created by the contract's description of the $5,900 fee for Phase One "as a retainer for [Rambo's] work as outlined through presentation of the study to the board." Rambo initially provided South Tama with a proposed agreement, and the company had ample opportunity then or in later negotiations to include a provision obligating South Tama to pay additional compensation to Rambo for its previous work upon the school district's receipt of funding (or upon some other occurrence). Rambo did not do so, and it fails to convince us that it struck such a bargain simply because the parties referred to the $5,900 fee as a retainer.

III.

We turn finally to Rambo's claim that South Tama was unjustly enriched as a result of Rambo's work and is thus liable in quasi-contract for the considerable value of the work that Rambo performed. A quasi-contractual recovery is, of course, barred when allowing one would conflict with a specific provision of an express contract. *See Smith v. Stowell*, 256 Iowa 165, 174, 125 N.W.2d 795, 800 (1964). Here, therefore, Rambo may not recover in quasi-contract for work performed on the study or in assisting with fund raising because, as we have already said, Rambo agreed to accept a specific sum for those efforts. We thus conclude that the district court correctly concluded that an unjust enrichment claim does not lie for those services.

But the district court also denied a quasi-contractual recovery for services other than those associated with the study and fund raising, and we think that its basis for doing so was incorrect. (We shall refer to these as "extra services.") There is language in some Iowa cases, language that the district court relied on, which, if read broadly and out of context, might seem to support the district court's holding that an action for unjust enrichment could never lie where there is an express contract between the parties. For instance, in *Giese Const. Co., Inc. v. Randa*, 524 N.W.2d 427, 431 (Iowa Ct. App. 1994), which the district court quoted with approval, there is a statement that

-15-

"[o]ne who pleads an express oral contract cannot ordinarily recover under an implied contract or quantum meruit."

First of all, however, the assertion that such a recovery cannot "ordinarily" be had indicates that the rule admits of some exceptions. More importantly, the case on which *Giese* relied, *Guldberg v. Greenfield*, 259 Iowa 873, 878-79, 146 N.W.2d 298, 301-02 (1966), simply made the procedural point that if a plaintiff's complaint did not contain a count for *quantum meruit*, the plaintiff could not recover in unjust enrichment whatever the proof. In other words, a complaint that is based solely on an express contract cannot serve as the basis for a *quantum meruit* recovery. This is the clear import of *Maasdam v. Maasdam's Estate*, 237 Iowa 877, 884, 24 N.W.2d 316, 320 (1946) (a case on which the *Guldberg* court itself relied), where the Supreme Court of Iowa expressly recognized that the rule under discussion had to do with pleading only. "One seeking to recover solely on an express contract," the court explained, "cannot recover on an implied contract, or upon a quantum meruit ... To do so would permit a factual variance," *i.e.*, a variance between pleadings and proof. But the court went on to explain that "[o]ne may, of course, plead these causes of action in separate counts." *Maasdam*, 237 Iowa at 884-85, 24 N.W.2d at 320. That is exactly what Rambo did here: Its complaint contains both a count for relief on the contract and a count for relief in *quantum meruit*, that is, off the contract.

There are other statements, of a different but similar kind, in the Iowa cases that also at first blush might appear to provide an impediment to Rambo's recovery, and the district court adverted to these. For instance, in *Giese*, 524 N.W.2d at 431, the court asserted that "[a]n express contract and an implied contract cannot coexist with respect to the same subject matter, and the law will not imply a contract where there is an express contract." But read in context, what the statement means is that an express contract necessarily trumps any implied one when there is a conflict between the two. As the court explained in *Clemens Graf Droste Zu Vischering v. Kading*, 368 N.W.2d

702, 712 (Iowa 1985) (relied on in *Giese*, 524 N.W.2d at 431), "the express contract supersedes the implied contract with respect to its terms." *See generally* Restatement (Third) of Restitution and Unjust Enrichment, pt. II, ch. 4, topic 2, intro. note, at 298-99, reporter's note, at 301-02 (Tentative Draft No. 3, 2004).

In this case, there is no conflict between the written contract and an implied contract in law to pay the value of the extra services. There is, for instance, no contract to pay a certain amount for those services; such a contract would obviously supersede any claim for *quantum meruit*. The only reason that a plaintiff would seek an unjust enrichment remedy in such circumstances would be if the reasonable value of its services exceeded the payment agreed to. But that would deprive the party sued of the benefit of his or her bargain and thus entirely undermine the foundations of contract law. In fact, the whole point in this case is that there was no contract, at least no written one, to pay for the extra services that Rambo rendered because the parties did not agree to the amount of fees payable for those services. Providing a quasi-contractual remedy in this case can therefore not conflict with the contract.

It is also important to this case that Rambo did not act officiously in rendering the extra services: It acted at the request of South Tama and was thus not a mere volunteer. We therefore see no reason that Rambo cannot recover in *quantum meruit*, provided that the record evidence is sufficient to determine the value to South Tama of the services beyond those associated with Phase One and with fund-raising that Rambo rendered at South Tama's request.

Since the district court did not make a finding on how much these services were worth to South Tama, or, indeed, what exactly those services were, we vacate the judgment on the *quantum meruit* claim and remand the claim to the district court for reconsideration. The district court should not take new evidence: Rambo has had its day in court and its case must rise and fall on the present record. The district court,

keeping in mind that Rambo bears the burden of proof, should examine the record to determine what services Rambo has rendered that can give rise to a *quantum meruit* claim and how much, if anything, Rambo is entitled to recover. Of course, Rambo cannot recover for any services that it rendered as a "public service" under Attachment A of the contract. We will retain jurisdiction over the case and await the district court's further determination.

_____