**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 21, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re: CENTRAL STATES
MECHANICAL, INC.,

Debtor.

----------------------------------

CENTRAL STATES MECHANICAL,
INC.,

Plaintiff - Appellant,

v.

AGRA INDUSTRIES, INC.,

Defendant - Appellee.

No. 12-3263
(D.C. No. 6:11-CV-01129-JTM)
(D. of Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **TYMKOVICH**, and **GORSUCH**, Circuit Judges.

---

Central States Mechanical is a Kansas company that subcontracted with

Agra Industries to install mechanical systems in two biofuel plants in Iowa.

Central States completed work at the Superior plant but discontinued work at the

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Plymouth plant before the job was finished. After declaring bankruptcy, Central States sued Agra for damages arising from both projects. In particular, Central States claimed over $1 million in damages and costs of work on the Superior project and over $3 million for the costs of its work and demobilization costs on the Plymouth project.

This appeal requires us to consider whether Central States was entitled to recover for costs it claims under the contracts. Following a two-week trial, the bankruptcy court issued a thorough 128-page opinion ruling. The court found in favor of Central States on several claims arising under the Superior contract but also concluded Central States materially breached the Plymouth contract when it discontinued work on the project without proper cause. Although the court denied most of Central States's claimed damages of over $1 million on the Superior project, the court awarded Central States almost $550,000 in damages under that contract. The court also awarded Agra close to $3 million on its counterclaim for Central States's breach of the Plymouth contract.[1] *In re Central States Mechanical, Inc.*, Ch.11 Case No. 09-12542, Adv. No. 09-5155, 2011 WL 1637991, at *126–27 (Bankr. D. Kan. Apr. 29, 2011). Central States appealed the decision to the district court, which affirmed the bankruptcy court in its entirety.

---

[1] The bankruptcy court also awarded Central over $96,000 plus interest for Agra's payment breach on an approved portion of a payment application for work Central States completed on the Plymouth Project.

Exercising jurisdiction pursuant to 28 U.S.C. § 158(d) and § 1291, we affirm the district court's decision. The bankruptcy court did not err in concluding that Central States was required to comply with the notice and claim provisions in both the Superior and Plymouth contracts. The bankruptcy court therefore did not err in refusing to award Central States damages for out-of-scope work it performed without complying with these contractual provisions. Further, the bankruptcy court's decision that Central States breached the Plymouth contract by suspending work and that Agra was entitled to damages was not clearly erroneous. And because any damages Central States did receive under the Superior contract were not substantial in light of its overall claims, the bankruptcy court did not err in refusing to award Central States attorneys' fees.

## I. Background

### A. The Parties

Agra was the general contractor on two biofuel plants in Iowa. The first plant, Superior, was constructed for Great Plains Renewable Energy. The second plant, Plymouth, was constructed for Plymouth Energy, LLC. Agra subcontracted to Central States the work of fabricating and installing the piping on both plants, as well as installing certain equipment, vessels, and valves ordered by third parties. Agra also employed an engineering consultant, Delta-T, to design the mechanical equipment for the plants that Central States would fabricate and install.

## B.   *The Superior Contract*

Under the Superior contract, Agra was required to pay Central States the "Cost of the Work" plus a fee of 12% up to a guaranteed maximum price (GMP) of about $11,900,000.  Agra agreed to make monthly progress payments based on the labor and value of the materials provided during the time period covered by each monthly pay application.

If Agra caused a delay in Central States's performance or Central States encountered unforeseen increased costs in performing the work, Central States was required to send Agra a notice and claim.[2]  Central States could then ask Agra to modify the Superior contract, but any changes in the payment amounts, additions or deletions to the work, or changes to the completion date could only be made by a change order that was executed and authorized by Agra's Project Manager and one of Agra's officers.  App. 3253.  Agra had five days to approve or reject a change order once Central States submitted it.  If the change order was not accepted or rejected within that time period, Central States was to continue

_____

[2]  The contract had specific notice and filing deadlines.  If Agra caused a delay in Central States's performance, Central States was required to send Agra a "delay notice" within three days of the inception of the delay or Central States's discovery of the delay.  App. 3256.  After giving Agra notice of the delay, Central States then was required to file a "delay claim" within twenty-one days of the occurrence of the delay.  App. 3369.  Central States waived its right to an extension of the subcontract time if it failed to give timely notice of the delay.  Central States was also obligated to give written notice of additional costs within twenty-one days after the occurrence of an event Central States believed involved additional costs and to submit a claim within thirty days of the event's occurrence.

within the original scope of the work. The contract required that "Work performed by [Central States] that exceeds the scope of the work in the Contract without a Change Order shall be at the expense of [Central States]." App. 3369.

In sum, Central States was required to follow three steps to obtain a valid extension of time to complete work, change the materials used, change the scope of work, or seek reimbursement for increased costs: (1) give notice; (2) submit a claim; and (3) obtain an approved change order. Agra was required to "expedite written responses" to Central States's change order requests and claims and notify Central States of any changes in the construction or submittal schedules. App. 3248.

## C.    *The Plymouth Contract*

The Plymouth contract obligated Agra to pay Central States a fixed sum of around $13,000,000. Like the Superior contract, Agra was required to make monthly progress payments to Central States, but at Plymouth the progress payments were based upon the percentage of the total work completed each month. Central States was required to "substantiate [the] accuracy" of each pay application with such data as Agra required. App. 3983. Agra then had ten days from receiving Central States's pay application to partially or fully reject the application and was required to pay Central States within forty-five days of approving Central States's pay application, even if Agra had not been paid by the owner of the plant. The Plymouth contract gave Agra the right to suspend the

-5-

work for any reason, although Central States could  "stop the Work" if Agra did not pay Central States through no fault of Central States.  App. 3978.

### D.    The Timeline

After beginning the Superior project in 2007, Central States immediately began to encounter delays caused by Delta-T's failure to deliver pipe drawings on time.  Although delays continued through the fall and winter of 2007 and early 2008, Central States never invoked the delay provisions in the subcontract.  In April 2008, Central States informed Agra that it had achieved substantial completion of the project and closed out the contract.

But, a month later, Central States presented a $1.08 million impact claim to Agra based on the delays and increased costs of work it had performed at Superior.  Nevertheless, it continued work on the Plymouth project.  Then, in early June 2008, Agra notified Central States that it was in default for failing to complete work on the Plymouth project.  In late June, Agra partially rejected Central States's request for reimbursement on the grounds that Central States did not properly substantiate the completed work.  Unable to resolve their differences, Central States demobilized and left the Plymouth site.  After sending multiple notices to Central States that Central States was in default for suspending work, Agra hired Wanzek, another subcontractor, to complete the Plymouth project.

### E. *Procedural History*

Central States filed for bankruptcy under Chapter 11 in August 2009. It then filed suit against Agra in bankruptcy court for damages under both the Superior and Plymouth contracts.

Central States claimed damages arising from its work at Superior for (1) $301,914 for the unpaid balance of the cost of work; (2) $1,136,608 in impact damages for extra time and expenses due to delays and late deliveries; (3) $242,535 in additional labor for a water treatment facility that was not within the original scope of the work; and (4) $149,063 related to nine disputed change orders. Central States also sought damages under the Plymouth contract for $3,124,056 arising from the value of the work it performed, costs of demobilization, and costs it incurred based on delays in construction. Agra counterclaimed for $3,088,259 in damages against Central States based on expenses Agra incurred in hiring another subcontractor to complete the Plymouth project.

The bankruptcy court awarded Central States approximately $550,000 for breaches of the Superior contract based on the unpaid balance for the cost of the work, interest on late progress payments, and the cost of constructing a water treatment plant that was not included in the initial contract. The court also found that Central States breached the Plymouth contract when it walked off the job, and awarded Agra damages for the cost of completing Central States's work, as

well as liquidated damages.  The court awarded Central States a small amount for one of Central States's Plymouth pay applications that Agra approved but never paid.  The bankruptcy court denied Central States attorneys' fees under the Superior contract.

The district court affirmed.

## II. Analysis

Central States claims the bankruptcy court erred in three ways.  First, it argues that the court erred by rejecting Central States's claims for additional damages under the Superior contract because Central States failed to comply with the contract's notice of claim and change order provisions.  Second, it contends the bankruptcy court should not have awarded Agra damages under the Plymouth contract because Agra's prior material breaches excused Central States from any duty to continue work, or, alternatively, that Agra did not prove that Central States's suspension of work caused Agra's damages.  Finally, Central States argues that it was entitled to attorneys' fees under the Superior contract because it was a substantially prevailing party.

We review de novo the bankruptcy court's conclusions of law.  *United States v. Richman (In re Talbot),* 124 F.3d 1201, 1206 (10th Cir. 1997).  We review the bankruptcy court's findings of fact for clear error.  *In re Blinder, Robinson & Co.,* 124 F.3d 1238, 1241 (10th Cir. 1997).  Both of the contracts stipulate that Iowa law applies.

### A. *Change Order and Notice of Claim Provisions—Superior Contract*

Central States first argues that the bankruptcy court erred in concluding that it violated the Superior contract by failing to comply with the change order and notice of claim provisions. It claims it had no duty to comply with the provisions for several reasons: (1) compliance was excused by Agra's prior material breach; (2) compliance was impracticable or futile; and (3) Agra waived the requirement of compliance with the provisions. Alternatively, Central States argues that it is entitled to recover the value of its work under *quantum meruit* or unjust enrichment theories.

#### 1. Material Breach

Central States first claims Agra materially breached the contract by failing to timely approve change orders, to timely procure valves and vessels for Central States to install, or to notify Central States that Delta-T was causing delays. Whether one party to a contract materially breached its duty under the contract is a question of fact. *See Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215 (8th Cir. 1987) (applying Iowa law). Accordingly, we review the bankruptcy court's decision for clear error. Although the bankruptcy court found that Agra did not "expedite" its responses to Central States's change orders, as it was required to do under the contract, the bankruptcy court found that it was "apparent that Central States performed the work before it submitted the change order and attempted to paper up the change order after the fact." *In re Central States Mech., Inc.*, 2011

WL 1637991, at *75. The bankruptcy court also found that Agra's "technical noncompliance" did not rise to the level of a material breach. *Id.* at *76. This finding is not clearly erroneous.

Under Iowa law, one party's contractual duties are discharged only by a material breach of the contract by the other party. To determine whether a breach is material, Iowa courts consider several factors derived from the *Restatement (Second) of Contracts*, including: (1) the extent to which the injured party will be deprived of the benefit it reasonably expected; (2) the extent to which the injured party can be adequately compensated for the loss of the benefit; (3) the extent to which the party failing to perform will suffer forfeiture; (4) the likelihood the party failing to perform will cure his failure; and (5) the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing. *See Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.*, 599 N.W.2d 684, 692 (Iowa 1999) (citing *Restatement (Second) of Contracts* § 241 (1981)).

Central States claims Agra's delays and failure to inform Central of delays deprived Central States of a benefit it reasonably expected: to continue working on schedule without additional costs or unanticipated extra work. But under the terms of the Superior contract, Central States was never obligated to perform out-of-scope work or incur extra costs that Agra had not approved; instead, Central States did so at its own peril. We agree with the bankruptcy court that Central

States therefore could not have reasonably expected to be compensated for out-of-scope work performed or extra costs incurred without a change order, unless Agra waived compliance with the claim provisions.[3]

Central States also argues that enforcing the claim provisions would result in a forfeiture of its rights under the contract. Under Iowa law, a forfeiture occurs by "the taking away or loss of rights and interest in property." *Van Hosen v. Bankers Trust Co.*, 200 N.W.2d 504, 507 (Iowa 1972). Here, however, the claim provisions do not take away any interests in property and do not terminate Agra's obligations under the contract. If Agra failed to comply with the change order provisions, Central States' recourse was simply not to perform the work. In other words, Central States was never required to incur the costs in the first place, so enforcing the claim provisions could not deprive Central States of any interest in the additional costs. Further, Central States could have sought mediation or

---

[3] Central States cites to *Board of Regents of the University of Texas v. S&G Construction Company*, 529 S.W.2d 90 (Tex. Civ. App. 1975), *overruled on other grounds by* 951 S.W.2d 401 (Tex. 1997), for the proposition that change order provisions are "not intended to operate as a shield for delays, changes, or expenses for which the paying party caused." Aplt. Br. at 33. In *Board of Regents*, the Board did not furnish housing plans to the contractor but nevertheless instructed it to do the work. *Id.* at 95–96. But that case is distinguishable from this one because the court in *Board of Regents* actually determined that the Board had materially breached the contract when it failed to provide plans, thereby discharging S&G's obligations to comply with the change order provisions. *Id.* at 96. Here, in contrast, we agree with the bankruptcy court that Agra did *not* materially breach the contract when it failed to timely expedite its responses to change order requests. Central States's argument also sounds in waiver, which we address below.

-11-

arbitration under the dispute resolution provisions of the contract if it believed it was unfairly denied compensation for extra work. Thus, Central States was not deprived of a right or interest in the additional costs of the work it undertook, nor was it precluded from disputing any denial of change orders or claims for compensation.

### 2. Impracticability

Central States next argues that compliance with the claim provisions should be excused because compliance would be impracticable or futile. It argues that Agra's delay in approving change orders left it in a quandary as to whether to continue work and save the project or suspend work while Agra considered the requests. Although the bankruptcy court did not specifically address the question of impracticability, it found that Agra "assisted and encouraged Central in submitting delay claims" and that there was "no evidence before the Court that Agra directed Central to proceed without an approved change order or agreed, verbally or in writing, to pay Central for the out-of-sequence work." *In re Central States Mech., Inc.*, 2011 WL 1637991, at *79.

Iowa does not recognize the doctrine of impracticability. *Associated Grocers of Iowa Coop., Inc. v. West*, 297 N.W.2d 103, 107–08 (Iowa 1980).[4] But

---

[4] Central States points us to a Kansas Supreme Court case, *Sunflower Elec. Co-op., Inc. v. Tomlinson Oil Co., Inc.*, 638 P.2d 963, 969 (Kan. 1981), which addressed the excuse of impracticability. Under Kansas law, an event is excused due to impracticability only if the following criteria are met: (1) the event cannot

(continued...)

-12-

even if we were to excuse compliance with the claim provisions on this basis, Central States still cannot show impracticability. True, Central States did not cause the delay in approving change orders. But Agra's delays in approving change orders were not unforeseeable, because the parties specifically included dispute resolution procedures to address such delays. Most importantly, the contract explicitly indicated that Central States was under no obligation to perform out-of-scope work unless approved by change order and that any work performed without a change order, or claims for extra costs that did not comply with the delay notice and claims provisions, would not be reimbursed.

Nor was compliance with the claim provisions futile. As we stated above, the bankruptcy court found that Agra actually "assisted and encouraged Central States in submitting delay claims by sharing Agra's delay claim form with Central States." *In re Central States Mech., Inc.*, 2011 WL 1637991, at *79. And over the course of the Superior project, Central States submitted 71 requests for change orders, 37 of which were approved for additional payment or extension of time. There is no evidence that Agra acted in bad faith in denying change orders. Rather, delays generally accumulated because Agra had to seek the owner's

_____

[4](...continued)
be caused by the promisor; (2) the promisor must have had no reason to know of the impracticability; and (3) the language or circumstances indicate that the promisor not be relieved because of the impracticability. *See Sunflower Elec. Co-op., Inc.*, 638 P.2d at 969. Central States acknowledges, however, that Iowa has not adopted this excuse.

-13-

approval on the change orders to increase payments to Central States. Absent any bad faith, compliance with the provisions was not futile. *Cf., e.g.*, *Lovrien v. Fitzgerald*, 66 N.W.2d 458, 461 (Iowa 1954); *Thompson v. Hirt*, 191 N.W. 365, 367–98 (Iowa 1923).

### 3. Waiver

Central States also argues that the claim provisions were a procedural preference that Agra waived by its conduct. The issue of waiver is generally one of fact, particularly where the waiver is predicated on acts or conduct. *Scheetz v. IMT Ins. Co. (Mut.)*, 324 N.W.2d 302, 304 (Iowa 1982). But where the evidence is undisputed, the issue of waiver is one of law for the court to decide. *Id.* At the bankruptcy level, evidence of whether Agra intended Central States to comply with claims and change order provisions was conflicting and contested. *See In re Central States Mech., Inc.*, 2011 WL 1637991, at *79. Accordingly, the bankruptcy court's determination that Agra did not expressly or impliedly waive the change order and claim requirements was a finding of fact we review for clear error.

Central States points to *Central Iowa Grading, Inc. v. UDE Corporation*, where the Iowa Court of Appeals held that written change order requirements can be waived "by the owner's knowledge of, agreement to, or acquiescence in such extra work, a course of dealing which repeatedly disregards the requirement, and a promise to pay for extra work, orally requested by the owner and performed in

reliance thereon." 392 N.W.2d 857, 860 (Iowa Ct. App. 1986). The "general rule is that recovery can be had for extra work *only if it was performed with the knowledge or consent of the adverse party*." *Id.* (emphasis added); *see also Booth v. Pilot Corp.*, No. 99-0925, 2001 WL 726364, at *6 (Iowa Ct. App. June 29, 2001).

The bankruptcy court found that Agra helped Central States submit delay claims, which in itself evidenced Agra's intent that Central States comply with the claim provisions. The court also found that Agra became aware of Central States's claims for $58,000 of out-of-sequence work (never approved by change order) *only after* the work had been performed. The bankruptcy court found no evidence that Agra "directed Central States to proceed without an approved change order or agreed, verbally or in writing, to pay Central States for the out-of-sequence work" on the nine disputed change orders. *In re Central States Mech., Inc.*, 2011 WL 1637991, at *79. And, by rejecting the papered-up change orders, Agra's course of dealing with respect to the disputed change orders indicated its intention *not* to waive compliance with the claim provisions. Based on this evidence, the bankruptcy court found that Agra did not waive the change order or the delay notice and claim requirement.[5]

---

[5] The bankruptcy court did find that Agra waived the change order requirement with respect to the water treatment plant that was not in the original scope of the work, and, alternatively, that Central States was entitled to recover *in quantum meruit* for the work performed on the water treatment plant.

On the other hand, the bankruptcy court found that an e-mail from one of Agra's employees confirmed that Agra did have some subcontractors work without a signed change order at times, and witnesses testified that an Agra employee directed Central States to perform out-of-scope work and provided assurances to Central States it would be "taken care of later." *Id.* at *46–47.[6] But Agra's employees all testified that they never told Central States or other subcontractors to proceed without a change order.

We can discern no clear error in the bankruptcy court's findings. In light of the directly conflicting testimony, no clear evidence can confirm that Agra repeatedly told Central States to proceed without change orders, or that Agra was aware that Central States was performing out-of-scope work and specifically approved, encouraged, or acquiesced to Central States's performing the out-of-scope work on the disputed change orders. *See Central Iowa Grading*, 392 N.W.2d at 860 (no waiver by owner where subcontractor performed extra work at the direction of the general contractor but without the knowledge of the owner)*; cf. Berg v. Kucharo Const. Co.*, 237 Iowa 478, 489 (Iowa 1946) (possible waiver where general contractor repeatedly directed subcontractor to continue with specifically identified out-of-scope work and repeatedly assured them they would

---

[6] The bankruptcy court also found that at one point Agra's project manager rebuked Central States's manager for refusing to perform work without a change order. However, the e-mail cited by the bankruptcy court indicates that Agra's manager believed the work was within Central States's scope of the work and therefore did not require a change order.

be paid later); *Booth,* 2001 WL 726364, at *6 (waiver where general contractor requested changes in scope of the work and general contractor's "course of dealing repeatedly disregarded the [change order] requirement, for reasons of apparent benefit to it, and by verbal approval of the items of work which carried estimated prices promised to pay for the work").

In sum, there is no evidence of a repeated course of dealing where Agra approved specific changes to the work. The bankruptcy court's finding is not clearly erroneous.

### 4. Quantum Meruit *or Unjust Enrichment*

Central States finally argues that the bankruptcy court misapplied Iowa law when it denied recovery for *quantum meruit* or unjust enrichment.

*Quantum meruit* denotes a subclass of implied-in-fact contracts for services rendered. *Iowa Waste Sys., Inc. v. Buchanan Cnty.*, 617 N.W.2d 23, 29 (Iowa Ct. App. 2000). To prevail on a *quantum meruit* theory, the plaintiff must show: (1) services were provided under such circumstances as to give the recipient reason to understand that (a) the services were being performed for the recipient and not some other person, and (b) the services were not rendered gratuitously but with the expectation of compensation from the recipient; and (2) the services were beneficial to the recipient. *Roger's Backhoe Serv., Inc. v. Nichols*, 681 N.W.2d 647, 652 (Iowa 2004). *Quantum meruit* recovery based on an implied-in-fact contract is normally reviewed for clear error under Iowa law when the relief

-17-

requested is damages. *Iowa Waste Sys., Inc.* 617 N.W.2d at 30. On the other hand, unjust enrichment is an equitable remedy of restitution. It is a quasi-contractual obligation that is created by law for reasons of justice, without any expression of assent, and is limited to the value of what was inequitably retained. We review unjust enrichment claims de novo. *Iowa Waste Sys., Inc.* 617 N.W.2d at 30.

Express and implied contracts cannot coexist with respect to the same subject matter, and Iowa courts will not imply a contract where an express contract exists. *Giese Constr. Co. v. Randa*, 524 N.W.2d 427, 431 (Iowa Ct. App. 1994). Thus, to the extent that the basis for the claim of *quantum meruit* is covered by an express contract, a party cannot state a claim for *quantum meruit* under Iowa law. *See Maasdam v. Maasdam's Estate*, 24 N.W.2d 316, 320 (Iowa 1946). The same principle also bars claims for unjust enrichment if the controversy is covered by an express contract. *See Iowa Network Servs., Inc. v. Qwest Corp.*, 363 F.3d 683, 694 (8th Cir. 2004) (holding that under Iowa law, "to the extent that the basis for [plaintiff's] claim of unjust enrichment is covered by an express contract . . . [plaintiff] cannot state a claim for unjust enrichment under Iowa law."); *Rambo Assocs. v. S. Tama Cnty. Cmty. Sch. Dist.*, 487 F.3d 1178, 1188–89 (8th Cir. 2007) (stating that under Iowa law "[a] quasi-contractual recovery [of unjust enrichment] is, of course, barred when allowing one would conflict with a specific provision of an express contract." (citations omitted)).

-18-

Here, the Superior contract provided for a fixed sum based on the cost of the work up to a guaranteed maximum price. The contract stated that any cost other than costs included in approved change orders that exceeds the guaranteed price would not be reimbursed. The bankruptcy court concluded that the parties had not waived the express contractual requirements for change orders and claims, and therefore declined to award Central States *quantum meruit* recovery on the disputed change orders. *See In re Central States Mech., Inc.*, 2011 WL 1637991, at *36.[7]

Central States contends the bankruptcy court erred, and points to *Rambo Associates*, an Eighth Circuit case applying Iowa law. In *Rambo Associates*, the parties agreed that the client could authorize Rambo to do extra work, with the fees for extra work to be negotiated at a later date. *Rambo Assocs.,* 487 F.3d at 1181–82. But the record showed that the client did in fact ask Rambo to do extra work several times after the initial phase of the work was completed, and never negotiated or set the fees for the extra work performed. *Id.* at 1183. The court found that quasi-contractual remedies were appropriate in large part because the client specifically requested Rambo do the extra work, and, therefore, allowing

---

[7] The bankruptcy court did allow Central States to recover *in quantum meruit* for the water treatment facility, but found that the water treatment facility was distinguishable from the other claims under the Superior contract because when Agra and Central States signed the Superior contract in 2006, the water treatment facility "was not in the picture and not contemplated in the Subcontract." *In re Central States Mech., Inc.*, 2011 WL 1637991, at *37.

-19-

the client to retain the value of the extra work would be inequitable. *Id.* at 1189.

Here, by contrast, Central States has not shown that Agra specifically requested it to perform the out-of-scope work on the disputed change orders without an approved change order. Further, in light of the contract's specific warnings that out-of-scope work performed without a change order was done at Central States's peril, the bankruptcy court correctly concluded that additional damages were not warranted.

Accordingly, because an implied-in-fact remedy would conflict with the express provisions of the contract, the bankruptcy court did not err in refusing to award Central States additional economic impact damages based on *quantum meruit* or unjust enrichment.

### B. *Agra's Damages for Costs of Completing the Plymouth Project*

Central States next contends that the bankruptcy court erred in awarding Agra damages based on the costs of completing the Plymouth project with another subcontractor. Central States claims that it had a right to suspend performance because Agra's prior material breaches excused Central States's continued performance. Even if Central States had no right to suspend performance, it argues that the bankruptcy court erred by awarding Agra damages without any proof that Agra's costs were caused by Central States's suspension (as opposed to delays by Delta-T).

## 1. *Central States's Right to Suspend Performance*

Central States claims that it was entitled to suspend performance because Agra breached the Plymouth contract by: (1) failing to notify Central States of delays caused by Delta-T; (2) failing to timely process change orders; (3) failing to timely progress payments; and (4) violating the covenant of good faith and fair dealing.

Central States essentially recycles its arguments from the Superior contract regarding Agra's alleged material breach based on Agra's failure to notify Central States of delays in getting materials and failure to timely process change orders. Although the bankruptcy court found that Agra's handling of change orders at Plymouth was "less than responsive" and that at one point Agra instructed Central States to "stop sending change orders,"[8] the bankruptcy court also found that Central States did not adhere to the delay notice and claim procedures. *In re Central States Mech., Inc.*, 2011 WL 1637991, at *89–90, 123–24. Because Central States did not comply with the delay notice and claim procedures, Agra had no duty to timely expedite the change orders. For the same reasons Central States failed to show a material breach of the Superior contract based on Agra's

---

[8] The bankruptcy court noted that Agra's statement to "stop sending change orders" did not imply a waiver of the change order process because this statement conformed to the subcontract provisions, *i.e.,* that Central States would submit written claim notices and Agra would then render a change order for Central States in conformity with the claim notice. *In re Central States Mech., Inc.*, 2011 WL 1637991, at *90 n.290.

delays, we agree with the bankruptcy court that Central States fails to show Agra materially breached the Plymouth contract when it failed to timely process change orders or notify Central States of foreseen delays in the work.

We also are not persuaded Agra materially breached the contract by failing to timely process payments to Central States. The bankruptcy court found that Agra had timely paid Central States on its first nine pay applications, and, only days before Agra partially rejected Pay Application 10, Agra had paid Central States $930,000 on Pay Application 9. The bankruptcy court also found that Agra did not materially breach the Plymouth contract by partially rejecting one of Central States's pay applications. Under the terms of the Plymouth contract, Central States was entitled to stop work only if Agra did not pay Central States through no fault of Central States. And Agra was entitled to reject pay applications and demand substantiation before making payment. The bankruptcy court found that Central States never substantiated the percentage completion as Agra requested prior to approval. The court also found that Agra's payment was not yet due by the time Central States walked off the Plymouth Project. We find no clear error in the bankruptcy court's conclusion that Agra did not breach the Plymouth contract.

Finally, Agra did not violate the implied covenant of good faith and fair dealing. Iowa recognizes the implied covenant of good faith and fair dealing in every contract that "the person for whom the work is contracted to be done will

-22-

not obstruct, hinder, or delay the contractor, but, on the contrary, will in all ways facilitate the performance of the work to be done by him." *Kaltoft v. Nielsen*, 106 N.W.2d 597, 602 (Iowa 1960). The bankruptcy court found that Agra partially rejected one of the pay applications because, based on its observations and a letter in which Central States stated twenty weeks worth of piping needed to be completed, it concluded that the stated completion figure was inaccurate. But on the same day it rejected Central States's pay application, Agra nevertheless certified to the owner of the plant in Agra's own pay application that the plant was nearly complete, using the completion figure that Central States claimed. The bankruptcy court found plausible Agra's explanation of this discrepancy as unrelated to Central States's completion of the Plymouth project.[9] In fact, the bankruptcy court noted that it was *Central States* who actually breached the implied covenant of good faith and fair dealing by walking off the Plymouth project and never supplying the requested documentation to substantiate its pay application.

The bankruptcy court's resolution of this discrepancy is not clearly erroneous. Agra needed cash from the owner before it could pay Central States,

---

[9] Agra's chief financial officer testified that Agra inflated the percentage completion figure because the owner refused to release contingency funds, which affected Agra's cash flow. Because the owner did not pay Agra but Agra still had to pay Central States, Agra was behind on cash flow. As a result, Agra inflated the percentage because the underfunded contingency should have been in place to cover the situation, and at the time Agra was $400,000 behind on cash flow.

which was why it certified the percentage completion to the owner even as it simultaneously rejected Central States's request. Agra's rejection was based on its perception that the project was further behind than Central States claimed, and it was entitled to ask for substantiation of the stated percentage of completion.

## 2. *Proof of Causation of Agra's Damages*

Central States next argues that the bankruptcy court erred in awarding Agra its costs of completion without requiring Agra to prove the amount of damages attributable to Central States's breach. Central States claims that much of the costs that Agra ultimately paid to the replacement subcontractor (Wanzek) were due to Delta-T's delays and not to Central States's breach. Central States claims that it would have been entitled to be reimbursed for the extra costs due to Delta-T's delay had it remained on the job and, therefore, that it should not have to pay the added costs due to Delta-T's delay.

We review the amount of damages calculated by the trial court for clear error and questions of law de novo. *Southern Colo. MRI, Ltd. v. Med-Alliance, Inc.*, 166 F.3d 1094, 1100 (10th Cir. 1999). The methodology the trial court uses in calculating a damage award is a question of law we review de novo. *Id.* At trial, Agra produced evidence showing that the amount Agra had to pay Wanzek, the replacement contractor, for work that was within the scope of Central States's work was $4,604,610. According to the terms of the contract, Agra was entitled to charge Central States for these costs, as well as a 15% fee, because the work

Wanzek performed was within the scope of Central States's work. Agra also incurred "non-Wanzek costs" to complete Central States's scope of the work, totaling $817,398. *In re Central States Mech., Inc.*, 2011 WL 1637991, at *105. Finally, under the Plymouth contract, Agra was entitled to charge Central States for liquidated damages of $4,000 per day for the number of days it took to complete the job. The bankruptcy court awarded Agra $2,992,259— Agra's "costs to complete Central States's scope of work"—as well as $96,000 in liquidated damages for the amount of time it took to mobilize Wanzek for the job, a total of $3,088,259.

This finding was not clearly erroneous. Under the terms of the contract, Central States was obligated to perform its scope of the work within the time allotted by the contract unless Central States obtained a valid extension of the substantial completion date. The only way to obtain a valid extension of the substantial completion date was giving Agra notice of a delay, submitting a delay claim, and obtaining an approved change order. The bankruptcy court found that Central States failed to comply with the delay notice and claim procedures, and therefore was not entitled to an extension of time. This finding is not clearly erroneous, because the delay notices and claims were dated well after the deadlines required in the contract, and, as we have previously stated, Agra did not waive compliance with the notice and claim procedures. Therefore, Central States would not have been entitled to recover any additional costs to complete

work that was within the scope of its work, even if the costs of completion were increased as a result of Delta-T's delay.

We therefore see no error in the bankruptcy court's finding that Agra was entitled to damages based on the costs of completion of work that was within Central States's scope of the work at the time it walked off, as well as liquidated damages based on the time Wanzek took to complete Central States's work.

### C.     Attorneys' Fees

Finally, Central States argues that it was a substantially prevailing party under the Superior contract[10] and should have been awarded attorneys' fees. Central States contends that, even though it was the net loser in bankruptcy court, it was the substantially prevailing party on its damages claims under the Superior contract because the bankruptcy court "accepted Central's theories of liability"; awarded Central damages of over $500,000; and "completely rejected Agra's defenses." Aplt. Br. at 55–56.

Under Iowa law, the trial court's decision to award attorneys' fees is reviewed for an abuse of discretion and will only be reversed when the trial court "rests its discretionary ruling on grounds that are clearly unreasonable or untenable." *Boyle v. Alum-Line, Inc.*, 773 N.W.2d 829, 832 (Iowa 2009).

---

[10]  The Superior contract included a provision requiring the losing party to pay reasonable costs, including attorneys' fees, to the "substantially prevailing party" in any litigation to enforce the terms of the contract.  App. 3393.

Iowa courts have not precisely addressed the issue of which party is the "substantially prevailing party" when the plaintiff has recovered on some of its claims and the defendant has recovered on its counterclaims. But the Iowa Supreme Court has held in at least one case that tying "the recovery of fees to a precise ratio of the amount of damages awarded over the amount demanded" is inappropriate in determining whether the plaintiff is a prevailing party. *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 541 (Iowa 1996) (construing whether plaintiff in Federal Age Discrimination in Employment Act and analogous state cause of action was prevailing party).

Other courts addressing this issue have adopted the "net prevailing party" rule, under which costs should be awarded to the plaintiff if its recovery exceeds the defendant's recovery on a counterclaim. *See*, *e.g.*, *Nw. Airlines, Inc. v. Flight Trails*, 3 F.3d 292, 297 (8th Cir. 1993) (holding that under Minnesota law, "'[p]revailing party' means the winner of the lawsuit" and rejecting defendant's claims that it was a prevailing party because it received significant setoffs); *Olsen v. Lund*, 246 P.3d 521, 522–24 (Utah 2010) (determining the prevailing party begins by "identifying the party in whose favor the net judgment is entered" and requires "not only consideration of the significance of the net judgment in the case, but also looking at the amounts actually sought and then balancing them proportionally with what was recovered . . . Consequently, a party that makes an outrageous claim and then receives only a fraction of what it demanded—though

-27-

the net judgment winner—will not likely be deemed the successful party."
(citations and internal quotation marks omitted)); *Schmidt v. Colonial Terrace
Assocs.*, 694 P.2d 1340, 1345 (Mont. 1985) ("Defendants succeeded in realizing,
at the end of the case, a net judgment in their favor, and thus prevailed on the
main issue in controversy."); *Szoboszlay v. Glessner*, 664 P.2d 1327, 1334 (Kan.
1983) (holding that a plaintiff was a prevailing party if he obtained a judgment
for an amount "in excess of the setoff or counterclaim allowed," even though the
defendant was allowed some recovery on a counterclaim); *Trollope v. Koerner*,
515 P.2d 340, 344 (Ariz. 1973) ("[A] party will be 'successful' if he obtains
judgment for an amount in excess of the setoff or counterclaim allowed"); *Nordin
Constr. Co. v. City of Nome*, 489 P.2d 455, 474 (Alaska 1971) ("A simple
balancing of the recovery in favor of each party makes it clear that the City was
the prevailing party in this lawsuit and should have been awarded costs").

Some courts leave it to the sole discretion of the trial court to determine
which party, if any, is the prevailing party "[w]hen a case involves many claims,
some of which are successful and some of which are not." *Archer v. Farmer
Bros. Co.*, 90 P.3d 228, 231 (Colo. 2004); *see also Holmes v. Holmes*, 874 P.2d
595 (Idaho Ct. App. 1994) (outlining statutory factors that should guide trial
court's discretion in determining which party prevailed and allowing the trial
court to find that a party to an action prevailed only in part and apportion costs
accordingly).

And the United States Supreme Court, in construing the term "prevailing party," in the context of civil rights fee-shifting statutes like 42 U.S.C. § 1988, has held that a plaintiff prevails if he is awarded some relief by the court. *See Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992) (holding that "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff"); *see also Buckhannon Bd. & Care Homes, Inc. v. W.Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001) (noting that a prevailing party is a "party in whose favor a judgment is rendered, regardless of the amount of damages awarded" or "one who has been awarded some relief by the court"). On the other hand, a "reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983).

Central States argues that under the Supreme Court's definition of "prevailing party," it is entitled to attorneys' fees because it was awarded some measure of relief that altered the parties' legal relationship: approximately $550,000 in damages based on the unpaid balance of the guaranteed maximum price, interest on late progress payments, and cost of its work on the water treatment plant. Agra contends that Central States was not the *substantially* prevailing party because Central States was the net loser in the case as a whole, since Central States was forced to pay Agra nearly $2,600,000 after Agra's setoffs

-29-

were taken into account. Alternatively, Agra contends that Central States was not the prevailing party on the Superior contract because Agra never substantially contested at least two of the three damage awards Central States received—the unpaid balance of the contract and the interest on the late progress payments.

The bankruptcy court found that Central States would be "hard pressed to claim 'victory,' either on the Superior Subcontract, or the case as a whole." *In re Central States Mech., Inc.*, 2011 WL 1637991, at *127. Regarding Superior, the bankruptcy court noted that Central States did not prevail on the largest portion of its Superior claims—the $1.134 million impact claim—and that most of the damages it did recover under the contract were not contested by Agra.[11] The bankruptcy court also stated that "[i]n addition, Central States's $3 million breach of the Plymouth Subcontract more than offsets its Superior recovery." *Id.* at *128.

No matter whether we adopt the definition that a prevailing party is one who prevails on a "significant issue" or one who is the net winner, we cannot say Central States was a substantially prevailing party under Iowa law. Although Central States did receive three damages awards under the Superior contract, none

---

[11] The bankruptcy court awarded Central States a little over $302,000 for the unpaid balance of the Superior contract, $242,535 for the work on the water treatment facility, and $5,100 in interest on late progress payments, for a total of approximately $550,000. Agra did not "vigorously" contest either the interest calculation or the unpaid balance. *In re Central States Mech., Inc.*, 2011 WL 1637991, at *127. Thus, the only part of Central States's award that was contested was the $242,000 for the water treatment facility.

of these damages claims was a "significant issue" in the litigation between Central States and Agra. The unpaid balance and interest on progress payments were not substantially contested or major issues at trial. And neither was the $242,535 costs of work on the water treatment plant. Rather, the main issues at trial were Central States's $1.3 million impact damages claim and Agra's over $3 million counterclaim against Central States for its alleged breach of the Plymouth contract. Central States lost on both of these claims, and was overall the net loser. After the bankruptcy court set off Agra's damages by the amount it owed to Central States, the aggregate damages Agra was entitled to receive amounted to over $2 million.

Under either the "significant issue" test or the "net prevailing party" test, the bankruptcy court did not err in concluding that Central States was not a substantially prevailing party. As a result, the bankruptcy court did not abuse its discretion in refusing to award attorneys' fees to Central States.

## III. Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court.

ENTERED FOR THE COURT

Timothy M. Tymkovich
Circuit Judge